## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE NEW Y-CAPP INC, JONATHAN
EUGENE COLEMAN, and DONNA
ZEMORIA PIERCE-BAYLOR

                         **Plaintiffs,**

v.

ARCH CAPITAL FUNDING, LLC; HIGH
SPEED CAPITAL, LLC; YELLOWSTONE
CAPITAL, LLC; MCA RECOVERY, LLC;
TSVI H. DAVIS; YITZHAK D. STERN;
AVRAHAM Y. WEINSTEIN and THE JOHN
AND JANE DOE INVESTORS,

                         **Defendants.**

Docket No.:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs The New Y-CAPP, Inc. ("Y-CAPP"), Jonathan Eugene Coleman ("Coleman"),

and Donna Zemoria Pierce-Baylor ("Pierce-Baylor") by and through their undersigned attorneys,

allege as against Defendants ("the Stern Organization") as follows:

## NATURE OF THE ACTION

1.      This is an action to save a small, community-centered business from Defendants'

unlawful predatory lending practices.

2.      Plaintiff Y-CAPP is an organization that provides behavioral healthcare services

to local children and adults who are in dire need of these social services.

3.      Defendants Yellowstone Capital, LLC ("Yellowstone"), Arch Capital Funding,

LLC (Arch"), and High Speed Capital, LLC ("HSC"), which are led and/or directed by

Defendants Tsvi Davis and Yitzhak Stern, are a three of a growing number of merchant cash advance ("MCA") companies whose entire scheme preys upon struggling small businesses.

4.      The Stern Organization provides funds to Plaintiffs, and other small businesses, through what it calls MCA agreements or factoring agreements. In actuality, these agreements are unquestionably loans.  However, the Stern Organization cannot call these transactions what they are (loans) because the whole point of its scheme is to avoid the usury laws of various states, including New York.  Thus, in order to charge the unlawful and unconscionable interest rates they seek to impose, the Stern Organization must call them by a different name.

5.      As the facts here demonstrate, however, the scheme is designed to drain the small businesses so they have to take out additional loans at the same or even worse interest rates.

6.      Even worse, by the time these small businesses get trapped into this scheme, the victims end up paying the Stern Organization usurious rates of interest to borrow the victim's own money because by that time, the Stern Organization has already accumulated windfall profits and it is essentially playing with house money.

7.      Once these small businesses begin to miss payments, the Stern Organization uses Defendant MCA Recovery to enforce the loans, employing unlawful and unscrupulous collection tactics designed to pressure borrowers into continuing the vicious cycle of paying ever-higher amounts of interest.

8.      As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

9.      The National Consumer Law Center reached the same conclusion:

Merchant cash advances operate very similarly to payday loans and have similar problems.  A lump sum of cash is taken out as an advance on a borrower's future sales.  The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[2]

10.     As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[3]

11.     The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[4]

12.     The New York Attorney General's Office has also acknowledged the damage these loans cause, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay." [5]

---

[2] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf.

[3] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[4] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

[5] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

13.     As here, the Stern Organization knows that in order for its victims to pay the usurious interest rates charged, the victims will have to enter into additional usurious loans with the Stern Organization or other MCA companies.

14.     In fact, Yellowstone recently admitted in a pleading in the Southern District of New York that "it is common in the industry, and it has been the experience of [Yellowstone], that merchants seek to (and do) renew and/or seek additional Merchant Cash Advance Agreements," and that these "renewals…are an important source of revenue for [Yellowstone]."

15.     The foreseeable consequences of the Stern Organization's actions are the devastation of small businesses all across the country, which are the backbone of our economy.

16.     As one small business protection advocate has put it, MCA companies, like the Stern Organization, are "in the business of helping [small] businesses fail." *Bloomberg, supra*.

17.     The facts of this case are a prime example of the unlawful and predatory conduct that these organizations have been warning about.

18.     From June 2012 until September 2017, the Stern Organization entered into a series of nineteen disguised loans with Y-CAPP at unconscionable and criminally usurious interest rates, some of which exceeded 500%.

19.     During this relationship, the Stern Organization collected upon the criminally usurious loans through ACH wire transfers, constantly monitored Y-CAPP's bank account, and persistently solicited additional loans on almost a monthly basis.

20.     In doing so, Defendant Tsvi Davis routinely and systematically solicited new loans near the end of the month by pretending to befriend Y-CAPP and giving their owners the false impression that Davis was looking out for Y-CAPP's best financial interest when, in fact, Davis was only looking out for his own financial interests and those of the Stern Organization.

4

21.     To be sure, once these debts became too large a burden, Davis revealed his true intentions by ruthlessly disregarding Y-CAPP's pleas for just a brief pause in payments when, for the first time in the six-year relationship, Y-CAPP suffered a significant lapse in receipts.

22.     Despite this unanticipated slowdown in receipts, Davis refused to accept anything but the fixed payment he unilaterally dictated.

23.     Indeed, as the Stern Organization admitted in its recent pleading before the Southern District of New York, "hardship" is not a defense to a merchant's payment obligation under any applicable law.

24.     This judicial admission and the actions of Davis in the present case reveal that the Stern Organization uses MCA agreements as a mere cover for its illegal loansharking enterprise. In truth and in practice, the Stern Organization treats its MCA agreements as loans that are absolutely repayable regardless of whether its victims generate sufficient receipts or not.  The Stern Organization ensures that these loans are absolutely repayable by designing their MCA agreements to result in a default in the event that its victim cannot pay the suffocating daily payments, which triggers its full recourse protections.

25.     To wit, here, Y-CAPP ran into the very Catch-22 that these MCA agreements are designed to create.  Due to the lack of receipts, Y-CAPP had two fatal choices:  (1) use whatever cash it had to pay its employees, taxes, rent and insurance and not pay Yellowstone; or (2) pay Yellowstone and not pay its employees, taxes, rent and insurance.  No matter what Y-CAPP chose, it would have been in breach of the MCA agreement.

26.     That is because, under the terms of the MCA agreements, Y-CAPP must warrant and covenant *during the entire term of the agreement* that "there has been no material adverse

changes, financial or otherwise, in such condition, operation or ownership of merchant."  Y-Capp must also warrant and covenant that it will pay all taxes and insurance.

27.     At the same time, Y-CAPP must make a fixed weekly payment to Yellowstone regardless of whether it has receipts or not.

28.      Thus, when Y-CAPP was faced with this Catch-22, it was at the complete mercy of the Stern Organization.

29.     Despite advising the Stern Organization on three separate occasions that Y-CAPP did not have sufficient receipts to make its required weekly payment, Davis arbitrarily demanded that Y-CAPP make a payment of at least $7,500 or else he would send Y-CAPP to the Stern Organization's legal department for enforcement of its full recourse protections.

30.     True to his word, when Y-CAPP was only able to make a payment of $5,000, Davis sent Y-CAPP to legal, a.k.a., MCA Recovery, for enforcement.

31.     At Davis' direction, within the same day, MCA Recovery obtained a fraudulent judgment by confession against Y-CAPP, Coleman, and Pierce-Baylor for $613,746.13.

32.     In obtaining this judgment by confession, the Stern Organization also tacked on $122,403.75 in attorney's fees for the ministerial task of filing an affidavit confessing judgment.

33.     The Stern Organization did all of this, at the direction of Davis, because Y-CAPP was short a mere $2,500.

34.     In obtaining this judgment by confession, the Stern Organization also defrauded the Clerk of Erie County, New York by falsely representing that it was entitled to file the Affidavit Confessing Judgment because Y-CAPP was in breach of the MCA agreement by blocking Yellowstone from debiting its account.  But Y-CAPP did not block the account—it

simply did not have sufficient funds to pay the amount unilaterally demanded by Davis. And Davis knew the true reason because Y-CAPP told him repeatedly.

35.     Even worse, Davis did not even tell Y-CAPP that the Stern Organization had obtained a judgment against Y-CAPP. Instead, when Y-CAPP inquired about the unexplained $122,403 charge on its account, Davis told Y-CAPP not to worry about it as long as it continued to make the weekly payments arbitrarily dictated by Davis.

36.     Thus, after obtaining a judgment against Y-CAPP, Davis continued to demand weekly payments from Y-CAPP by using the threat of its fraudulent judgement as enforcement.

37.     The facts of this case are truly outrageous, and they reveal the true purpose of the Stern Organization. At bottom, it is an illegal loansharking enterprise that uses the masquerade of an MCA agreement to hide the true nature of its criminally usurious loans.

## THE PARTIES

38.     Plaintiff The New Y-CAPP, Inc. is a corporation duly organized under the laws of Virginia with its principal place of business located in Richmond, Virginia.

39.     Plaintiff Jonathan Eugene Coleman is an individual citizen and resident Chesterfield, Virginia.

40.     Plaintiff Donna Zemoria Pierce-Baylor is an individual citizen and resident of Midlothian, Virginia.

41.     Defendant Arch Capital Funding, LLC is a limited liability company organized under the laws of New York with a principal place of business at 160 Pearl Street, New York, NY 10005. On information and belief, each of its LLC members is a citizen of New York or California.

42.     Defendant High Speed Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  On information and belief, each of its LLC members is a citizen of Delaware, New York or New Jersey.

43.     Defendant MCA Recovery, LLC, is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 17 State Street, Suite 4000, New York, New York 10004.  On information and belief, each of its LLC members is a citizen of New York or New Jersey.

44.     Defendant Yellowstone Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Jersey City, New Jersey 07302.  Its LLC members are citizens of Delaware, New Jersey and/or New York.

25.     Defendant Tsvi H. Davis (a.k.a Steve Davis) is an adult resident and citizen of New York who resides at 2201 Avenue M, Brooklyn, NY 11210.

26.     Defendant Avraham Weinstein (a.k.a. Josh Weinstein) is an adult resident and citizen of New York who resides at 210 Aycrigg Ave, Passaic, New Jersey 07055.

27.     Defendant Yitzhak D. Stern (a.k.a. Isaac Stern) is an adult resident and citizen of New Jersey who resides at 220 Surrey Rd., Hillside, NJ 07205.

45.     The John and Jane Doe Investors are individuals who have provided capital to fund the criminally usurious loans and to help further the illegal purpose of the Stern Organization.  On information and belief, each of the John and Jane Doe Investors are citizens of California, Delaware, Florida, New Jersey or New York.

## JURISDICTION

46.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

47.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

48.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

49.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

50.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

51.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## FACTUAL BACKGROUND

**A.     Y-CAPP's Business.**

52.     Y-CAPP (also known as "Youth Challenged Advised & Positively Promoted") is devoted to supporting and educating families dealing with various behavioral health issues in the Richmond, Tidewater, and Charlottesville, North Carolina area.

53.     Y-CAPP empowers individuals to reach their goals despite behavioral issues through the various programs including therapeutic day treatments, in-home counseling, mental health skills, summer camps, applied behavioral analysis programs, and parenting groups.

54.     The organization is owned and operated by Coleman and Pierce-Baylor.

**B.     The Stern Organization Loans.**

55.     In 2012, Y-CAPP sought to hire new staff to aid in expanding its reach in the community.  To accomplish this goal, they began looking for additional sources of capital.

56.     Y-CAPP secured this capital in June 2012, under a purported merchant agreement provided by the Stern Organization through Yellowstone.

57.     This transaction was not a true factoring agreement but a disguised, illegal, usurious loan.  However, by sending and collecting upon the disguised loan to Y-CAPP, the Stern Organization intended to give Y-CAPP the impression that the transaction was a binding legal agreement when it was not.

58.     From that day on, Y-CAPP was trapped in a cycle of never ending debt with the Stern Organization.

59.     Over a six-year period, the Stern Organization constantly monitored Y-CAPP's bank accounts and solicited additional loans for Yellowstone and other companies within the Stern Organization, such as Arch, Fast Business Funding, and HSC.

60.     The proceeds from one Stern Organization loan would routinely be used to pay the remaining balance on another Stern Organization's loan.

61.     The Stern Organization's loans were funded, and collected, through the use of interstate wires.  Each instance of funding or collection was designed to give Y-CAPP the false impression that each agreement was a legal and enforceable transaction when it was not.

62.     Each text message by Davis, on behalf of the Stern Organization, regarding the collection of these loans, also gave the false impression that each agreement was enforceable.

63.     As set forth in the following table, the Stern Organization entered into nineteen loans with Y-CAPP, charging $843,766 in total interest (not including fees):

| Date | Organization | Loan Amount | Payback Amount | Interest | Interest Rate |
|------|-------------|-------------|----------------|----------|---------------|
| 6/27/2012 | Yellowstone | $50,000 | $69,950 | $19,950 | 42% |
| 7/2/2012 | Yellowstone | $50,000 | $64,000 | $14,000 | 170% |
| 9/7/2012 | Yellowstone | $125,000 | $160,000 | $35,000 | 170% |
| 1/7/2013 | Yellowstone | $50,000 | $64,000 | $14,000 | 190% |
| 1/14/2013 | Fast Business | $60,000 | $87,540 | $17,540 | 95% |
| 9/10/2013 | Yellowstone | $200,000 | $258,950 | $58,950 | 163% |
| 12/16/2013 | Yellowstone | $225,000 | $292,275 | $67,275 | 71% |
| 6/30/2014 | Yellowstone | $21,500 | $29,976 | $8,476 | 553% |
| 7/25/2014 | Yellowstone | $90,000 | $119,990 | $29,990 | 276% |
| 9/9/2014 | Yellowstone | $200,000 | $271,800 | $71,800 | 196% |
| 12/16/2014 | Yellowstone | $200,000 | $271,800 | $71,800 | 106% |
| 9/17/2015 | Yellowstone | $130,000 | $176,990 | $46,990 | 155% |
| 12/18/2015 | Arch Capital | $25,000 | $30,000 | $5,000 | 243% |
| 4/20/2016 | Arch Capital | $30,000 | $35,000 | $5,000 | 203% |
| 6/28/2015 | Yellowstone | $100,000 | $114,995 | $14,995 | 260% |
| 7/27/2016 | Yellowstone | $330,000 | $445,500 | $115,000 | 44% |
| 5/3/2017 | HSC | $20,000 | $26,000 | $6,000 | 313% |
| 7/20/2017 | HSC | $200,000 | $271,900 | $71,900 | 279% |
| 9/6/2017 | Yellowstone | $400,000 | $559,600 | $159,600 | 58% |
| **Total** | | **$2,506,500** | **$3,340,266** | **$843,766** | **Avg. 189%** |

64.     Although the interest rate was disguised on the face of these agreements, the actual facts demonstrate that the Stern Organization intended to charge, and did in fact, charge a criminally usurious rate of interest far in excess of 25%.

65.     **Loan #1 (Yellowstone):**   The first criminally usurious loan that Y-CAPP entered into was with Yellowstone on June 27, 2012.

66.     The loan amount was $50,000 and the principal and interest was $69,950.

67.     On its face, Y-CAPP was to repay the loan by fixed daily payments of $279, which equates to a payment period of 350 days.  This fixed daily payment is disguised as a

11

purported good-faith estimate of what would equate to 8% of Y-CAPP's daily receivables.  The Stern Organization unilaterally included this term to disguise the true nature of the transaction.

68.     Likewise, $279 does not remotely represent a good-faith estimate of 8% of Y-CAPP's daily receivables.  Instead, it is a unilateral term inserted by the Stern Organization to disguise the true nature of the transaction.

69.     On the face of the agreement, Yellowstone intended to charge and receive a simple interest rate of at least 42%.

70.     **Loan #2 (Yellowstone):**   Just a few days later, Davis induced Y-CAPP to enter into a second criminally usurious loan with Yellowstone on July 2, 2012.

71.     The loan amount was $50,000 and the principal and interest was $64,000.

72.     On its face, Y-CAPP was to repay the loan by fixed daily payments of $279, which equates to payment period of 320 days.  This fixed daily payment is disguised as a purported good-faith estimate of what would equate to 8% of Y-CAPP's daily receivables.

73.     Likewise, $279 does not remotely represent a good-faith estimate of 7% of Y-CAPP's daily receivables.  Again, this is a unilateral term inserted by the Stern Organization to disguise the true nature of the transaction.

74.     While on the face of the agreement, the Stern Organization charged a simple interest rate of at least 29%, the actual interest rate actually negotiated and agreed upon by the parties was much greater.  The actual term negotiated by the parties was 60 days.

75.     Despite the stated daily payment amount of $279, the Stern Organization did in fact collect the full repayment amount within 60 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 170%.

76.     **Loan #3 (Yellowstone):**   Davis induced Y-CAPP to enter into a third criminally usurious loan with Yellowstone on September 7, 2012.

77.     The loan amount was $125,000 and principal and interest was $160,000.

78.     While on its face, Y-CAPP was to repay the loan based on 12% of its daily receivables, the parties had actually negotiated and agreed upon a repayment term of 60 days. Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

79.     Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 60 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 170%.

80.     **Loan #4 (Yellowstone):**   Davis induced Y-CAPP to enter into a fourth criminally usurious loan with Yellowstone on January 7, 2013.

81.     The loan amount was $50,000 and the principal and interest was $64,000.

82.     While on its face, Y-CAPP was to repay the loan based on a percentage of its daily receivables, the parties had actually negotiated and agreed upon a repayment term of 60 days.  Again, this is a unilateral term inserted by the Stern Organization to disguise the true nature of the transaction.

83.     Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 60 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 190%.

84.     **Loan #5 (Yellowstone):**   Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on September 10, 2013.

85.     The loan amount was $200,000, and the principal and interest was $258,950.

86.     While on its face, Y-CAPP was to repay the loan based on 10% of its daily receivables, the parties had actually negotiated and agreed upon a payment term of 66 days. Again, Yellowstone unilaterally included this term to disguise the true nature of the transaction.

87.     Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 66 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 163%.

88.     **Loan #6 (Yellowstone):**  Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on December 16, 2013.

89.     The loan amount was $225,000 and principal and interest was $292,275.

90.     While on its face, Y-CAPP was to repay the loan based on 11% of its daily receivables, the parties had actually negotiated and agreed upon a repayment term of six months. Again, Yellowstone unilaterally included this term to disguise the true nature of the transaction.

91.     Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within six months as negotiated and agreed upon, which resulted in a simple interest rate of 71%.

92.     **Loan #7 (Everest/Fast Business):**  Davis induced Y-CAPP to enter into another criminally usurious loan with its affiliate Fast Business Funding on January 4, 2014.

93.     The loan amount was $60,000 and the principal and interest was $87,540.

94.     On its face, Y-CAPP was to repay the loan by fixed daily payments of $1,100. The Stern Organization did not even attempt to disguise the fixed payment term.  Instead, the fixed number of daily payments (80) was stated right on the face of the agreement.

95.     On the face of the agreement, the Stern Organization intended to charge and receive a simple interest rate in excess of 95%.

14

96. **Loan #8 (Yellowstone):** Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on June 30, 2014.

97. The loan amount was $21,500 and principal and interest was $29,976.

98. While on its face, Y-CAPP was to repay the loan based on 5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 26 days. Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

99. Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 26 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 553%.

100. **Loan #9 (Yellowstone):** Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on July 25, 2014.

101. The loan amount was $90,000 and principal and interest was $119,990.

102. While on its face, Y-CAPP was to repay the loan based on 7.5% of its daily receivables, the parties had actually negotiated and agreed upon fixed repayment term of three months, which would have resulted in an interest rate in excess of 117%. Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

103. Despite the stated daily percentage amount, the Stern Organization nonetheless collected the full repayment amount in exactly 44 days by requiring Y-CAPP to pay off the loan early through a new criminally usurious loan with the Stern Organization, which resulted in an unconscionable simple interest rate of 276%.

104. **Loan #10 (Yellowstone):** Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on September 9, 2014.

105.    The loan amount was $200,000 and principal and interest was $271,800.

106.    While on its face, Y-CAPP was to repay the loan based on 9.5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three months, which would have resulted in an interest rate of 146%.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

107.    Despite the stated daily percentage amount, the Stern Organization nonetheless collected the full repayment amount in exactly 67 days by requiring Y-CAPP to pay off the loan early through a new criminally usurious loan with the Stern Organization, which resulted in an unconscionable simple interest rate of 196%.

108.    **Loan #11 (Yellowstone):**  Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on December 16, 2014.

109.    The loan amount was $200,000 and the principal and interest was $271,800.

110.    While on its face, Y-CAPP was to repay the loan based on 9.5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of four months.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

111.    Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within four months as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 106%.

112.    **Loan #12 (Yellowstone):**  Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on September 17, 2015.

113.    The loan amount was $130,000 and the principal and interest was $176,990.

16

114.    While on its face, Y-CAPP was to repay the loan based on 6% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three months.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

115.    Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within six months as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 155%.

116.    **Loan #13 (Arch):**   Davis induced Y-CAPP to enter into another criminally usurious loan with its affiliate Arch on December 18, 2015.

117.    The loan amount was $25,000 and the principal and interest was $30,000.

118.    While on its face, Y-CAPP was to repay the loan based on 10% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 40 days.  Again, Arch unilaterally included this term to disguise the true nature of the transaction.

119.    Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 40 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 243%.

120.    **Loan #13 (Arch):**   Davis induced Y-CAPP to enter into another criminally usurious loan with Arch on April 20, 2016.

121.    The loan amount was $30,000 and the principal and interest was $35,000.

122.    While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 40 days.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

17

123.    Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within 40 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 203%.

124.    **Loan #15 (Yellowstone):**    Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on June 28, 2016.

125.    The loan amount was $100,000 and the principal and interest was $114,995.

126.    While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three weeks.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

127.    Despite the stated daily percentage amount, the Stern Organization did in fact collect the full repayment amount within three weeks as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 260%

128.    **Loan #16 (Yellowstone):**    Davis induced Y-CAPP to enter into another criminally usurious loan with Yellowstone on July 27, 2016.

129.    The loan amount was $330,000 and the principal and interest was $445,500.

130.    While on its face, Y-CAPP was to repay the loan based on 9% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of eight months.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

131.    This agreement also contains an Addendum, which purports to adjust the daily payment to just $1,000 per day.  Yet again, this Addendum was unilaterally included by Yellowstone to disguise the criminally usurious nature of the transaction.

18

132.     Despite the stated daily percentage and daily payment amount listed on the Addendum, the parties had expressly negotiated an eight-month term.  Specifically, the parties agreed that Y-CAPP would make weekly payments of at least $20,000 per week, but only $10,000 per week when payroll was due.  This agreement is confirmed by numerous texts between Y-CAPP and Davis.

133.     In fact, on numerous occasions, Davis demanded that the fixed $10,000 weekly payment be paid, and if a payment was missed, Davis demanded that the payment be made up by debiting twice the agreed amount the following week.

134.     Davis also charged $10,000 for bouncing the weekly payments when Y-CAPP could not make the suffocating weekly payments.

135.     As agreed and intended by the parties, the Stern Organization did in fact collect the full repayment amount in approximately eight months (292 days) as negotiated and agreed upon, which resulted in a simple interest rate in excess of 44%.

136.     **Loan #17 (HSC):**  Davis induced Y-CAPP to enter into another criminally usurious loan with HSC on May 3, 2017.

137.     The loan amount was $20,000 and principal and interest was $26,000.

138.     While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had expressly negotiated and agreed upon a fixed repayment term of 30 days.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

139.     These confirmed terms are reflected in texts between Y-CAPP and Davis.

140. As expressly negotiated by the parties in advance, Y-CAPP was to repay the loan through 26 fixed daily payments of $999. This negotiated amount is actually reflected in an Addendum to the loan, which fixes the daily payments at $999 per day.

141. Moreover, Davis warned Y-CAPP that it would not be allowed to miss a payment, and if it did, Y-CAPP would be charged $2,500 if there were more than two "bounces."

142. Thus, just like all of the other agreements, in order to avoid the criminal laws of this state, the Stern Organization disguised this fixed daily payment by falsely representing on the face of the agreement that the $999 per day is a good-faith estimate of 15% of Y-CAPP's daily receivables.

143. As negotiated by the parties, and as reflected in Davis' own text, the Stern Organization collected the full repayment amount in exactly "26 business days" and "35 calendar days," which resulted in an unconscionable simple interest rate of 313%.

144. **Loan #18 (HSC)**:  Davis induced Y-CAPP to enter into another criminally usurious loan with HSC on July 20, 2017.

145. The loan amount was $200,000 and the principal and interest was $271,900.

146. While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

147. These confirmed terms are reflected in texts between Y-CAPP and Davis.

148. As expressly negotiated by the parties in advance, Y-CAPP was to repay the loan through 27 fixed weekly payments of $9,995. This negotiated amount is actually reflected in an Addendum to the loan, which fixes the weekly payments at $9,995 per day.

149.     Thus, just like all of the other agreements, in order to avoid the criminal laws of this state, the Stern Organization disguised this fixed daily payment by falsely representing on the face of the agreement that $9,995 per week is a good-faith estimate of 15% of Y-CAPP's weekly receivables.

150.     As negotiated by the parties, and as reflected in Davis' own text, the Stern Organization intended to charge and collect the full repayment amount in exactly 27 weeks, which would have resulted in a simple interest rate in excess of 70%.

151.     The actual interest rate charged and received by the Stern Organization, however, was even worse because Davis required Y-CAPP to pay off the loan early just 47 days later for the privilege of taking out yet another criminally usurious loan with the Stern Organization.

152.     The unconscionable interest rate on this loan was in excess of 279%.

153.     **Loan #19 (Yellowstone):**  Davis induced Y-CAPP to enter into the last and final criminally usurious loan with Yellowstone on September 6, 2017.

154.     The loan amount was $400,000 and the principal and interest was $559,600.

155.     Yellowstone also charged Y-CAPP an outrageous $20,000 origination fee.

156.     While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of ten months.  Again, the Stern Organization unilaterally included this term to disguise the true nature of the transaction.

157.     As expressly negotiated by the parties in advance, Y-CAPP was to repay the loan through "weekly payments of 12,500 until October 10 and then 12,500 and 20k every other week."

158.     These confirmed terms are reflected in texts between Y-CAPP and Davis.

21

159.    Among these texts, Davis admitted that this "is a long deal (10 months)...."

160.    This negotiated amount is also reflected in an Addendum to the loan, which fixes the weekly payments at $19,995 per day.

161.    Thus, just like all of the other agreements, in order to avoid the criminal laws of this state, the Stern Organization disguised this fixed daily payment by falsely representing on the face of the agreement that $19,995 per week is a good-faith estimate of 15% of Y-CAPP's weekly receivables.

162.    Notably, this purported good-faith estimate is twice the good-faith estimate of the prior July 20, 2017 agreement that, just six weeks earlier, falsely represented the same percentage of receivables was $9,995.   Y-CAPP's receivables did not double in six weeks.

163.    As negotiated and agreed upon by the parties, and as reflected in Davis' own texts, the Stern Organization intended to charge and collect the full repayment amount over ten months, which results in a simple interest rate in excess of 50% without consideration of the $20,000 Origination Fee.  When counting this outrageous fee, the simple interest rate exceeds 58%.  Either way, both are twice that permitted under New York criminal law.

**D.    The Stern Organization Intentionally Disguised the True Nature of the Transaction.**

164.    Despite its documented form, the transactions are, in economic reality, a loan that was absolutely repayable.  Among other hallmarks of a loan:

    (a)    The Daily/Weekly Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

    (b)    The default and remedy provisions purported to hold Y-CAPP absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate Y-CAPP to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after only two instances of insufficient funds being maintained in the Account, Y-CAPP was in default and, upon default, the outstanding balance of the Purchased Amount purportedly became immediately due and owing;

(c) While the agreements purported to "assign" all of Y-CAPP's future account receivables to the Stern Organization until the Purchased Amount was paid, Y-CAPP retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Stern Organization merely acquired a security interest in Y-CAPP's accounts to secure payment of the Purchased Amount;

(d) The transaction was underwritten based upon an assessment of the Y-CAPP's credit worthiness; not the creditworthiness of any account debtor;

(e) The Purchased Amount was not calculated based upon the fair market value of Y-CAPP's future receivables, but rather was unilaterally dictated by the Stern Organization based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Stern Organization did not request any information concerning Y-CAPP's account debtors upon which to make a fair market determination of their value;

(f) The amount of the Daily Payments was determined based upon when the Stern Organization wanted to be paid, and not based upon any good-faith estimate of Y-CAPP's future account receivables;

(g) The Stern Organization assumed no risk of loss due to Y-CAPP's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h) The Stern Organization required that Y-CAPP undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Stern Organization from any risk of loss resulting from Y-CAPP's failure to generate and collect receivables.

(i) The Stern Organization required that Y-CAPP grant it a security interest in its receivables and other intangibles and, further that Coleman and Pierce-Baylor personally guarantee the performance of the representations, warranties and covenants, which the Stern Organization knew were breached from day one.

**D. Davis' Text Messages Reveal the True Nature of the Transaction.**

165. The MCA agreements used by the Stern Organization are a mere cover for the usurious nature of the transaction.

166. Despite the form of the transaction, each transaction was an advance of money with interest that was absolutely repayable over a fixed period of time.

167.    Below are just a few examples, of the actual terms of the loans:

the 12,500 is that payment for both or will i have two payments?  we cant do that



I know you can't do that. You want a lot of money. Anyone that does a deal needs to get paid in a certain time frame

You have a 39k balance so would be an 85k deal. I'll do the cheap factor we always do which is 1.35 and over 20 weeks 5750 weekly

we won't need to do 85 we can do 75k at cheap rate of 1.33 and payback will be 99,950

Weekly payment will be 4995 a week

20k paying 26 at 999 daily payment. That's 26 business days 35 calendar days

26 payback I agreed to and you said 30 days and this is 40 days now at if we start Tuesday. 20k contracts I can't do 0 fees it's already 3k discount on t

he payback.

Total pay back amount?

139,900 it's 6 months term

200k paying 271,900 at 9,995 weekly

24

I can prob make something happen for 200k which would be about 185k in the bank and 12,500 weekly. But don't want to put you in a bad position making payments

I can do 400k paying off your balance of 252,000 purchasing 559,600 weekly payment of 12,500 until October 10th and then 12,500 and 20k every other week

You will net 145k in account and that's 1% origination fees which is a greattt deal. This is a long deal (10 months) and cheaper deal and it's what I can

need a short term loan. we just got this information. we need 153k in the bank. get 133k bank in two weeks and the remaining 10 plus what you charge for a short term loan back over the

il then and 133k wire or debit on sep 5th and remainder split over the next 2 weeks. So if paid by by the 19th of September will be a 31,600 discount to

t for it to make sense. I can do 158k (netting 152,500) purchasing 224,995. will offer a 20% discount if paid by sep 19th. No daily or weekly payment unt

I can't do that bc at the end of the day I work for a company and can't do 10k for a month on 160k it doesn't work. My cost of capital is more than that

As per our agreement we are scheduled to
debit 19,995 for tomorrow plus I need 7500
as a wire as discussed. If you want you can

What other lender? You can't afford our
patents and now you thjnk you can pay a
new lender also??

168.    The text messages from Davis further confirm that the loan amount was
absolutely repayable and that if payments were not made as demanded, Y-CAPP would be in
breach and face legal action, which is exactly what happened:

Mannnn Donna is not feeling good about
any deal because of what John did to us
and you taken that extra  $10,000 today.
She said she didn't think you would do stuff
like that. I will check back with her next
week and get with you. Thanks for having
my back bro.

We did make up for last week which
bounced

Need answers asap or legal is filing the
judgement

It's a problem

I understand but we need payments going
forward and to be debited. Call me today to
discuss. Thanks

That's not going to work. We gave you an
extremely long and good deal of payments
were normal and now we are very behind
and 7500 and 5 is not doable. 1

0 and 7500 is bare bones minimum that
we need. And if there are more bounce
payments it's out of my control and legal
will file and we both don't want th

I will set up 9,999 for tomorrow and 7500 for the week after that 50% reduction. Make sure there are no bounces or issues on this or it will be out of my



Let me know bc we can not have another bounce. Thanks

Jon I did everything you asked for and we are on very reduced weekly payments. We need 7500 minimum a week as agreed

Sure the 7500 clears or legal will file the affidavit of confession of judgment and we both DO NOT WANT THAT. please advise asap

Jon I can't do that. 7500 is the bare bones minimum we need. I can't have a week with nothing paid or legal will take over and will be outa my hands

I can't wait for a lender to come through. Need the weekly payment for this coming Tuesday back on and won't do a makeup for now. If it bounces again I w

ill not be able to stop legal from filing

We need payments to clear tomorrow to avoid legal action. Please confirm they will clear for the 7500

I need that to hold off my legal department. Make it happen thanks

169.    The text messages from Y-CAPP also demonstrate that it understood that the loans were absolutely repayable even if Y-CAPP had to borrow money to repay:

man the other 7500 didnt come. doing all i can just to stay open. have to pay you, irs, insurance.  the 7500 a week is killing us. cant get any additional business like we thought

I have two other lenders who im trying to get the money from. i didnt know we would only get 88k today with 65k to taxes and 50k for a must pay for health insurance. they will let me know something within 24 hours. im pushing as hard as i can

I know you need a weekly payment but they didn't give to me today. i working to get it from the other linder. they are working on it now and will have a answer within 24 hours

i have no other alternative. to make rhis payment this week

im working on it ad hard as hard as i can. got denied by one Lender looking for the other one to give me an answer tomorrow. i promise you im trying to get your weekly payment.  i know whats on the line

i know you jave worked with me. we are rite there. we have added about 50 new students over the last few months but with the days out of school and the holidays it has made us short. i didnt know we would only get 88k this week. im trying to get your money and pay taxes and make payroll. i have to do all 3 to make sure the money still comes in. if i dont pay the taxes we are done, if i dont pay you we are done and if i dont pay payroll and insurance i dont have any one to work. im trying to get it

### E.    Yellowstone's Fraudulent Judgment

170.    As further security to ensure that its loans were absolutely repayable, the Stern Organization required Plaintiffs to sign an affidavit confessing judgment.

171.    In November 2017, various factors delayed Y-CAPP's receipt of additional income.  Additionally, the company was forced to incur several large expenditures.

172.    In light of these circumstances, on November 27, 2017, Y-CAPP requested that Yellowstone briefly suspend the required weekly payments for three weeks, explaining:

> The New Y-CAPP Inc. would like to make an official request for a temporary suspension of our weekly deductions for the next three weeks.  This week our agency will only receive approximately $83,000 and YCAPP has an obligation with a tax balance of $62,000 and a $50,000 insurance payment.  With these payments, it has left YCAPP unable to sustain any additional deductions.  YCAPP is aware that any bounced payments could lead to legal actions from your company and for this reasons we are requesting a brief suspension of payments. While we have received the MIS numbers needed to generate the additional funds, it will take at a minimum 3 weeks for The New Y-CAPP Inc. to begin to receive payments making it impossible for us to meet our obligations to Yellowstone Capital at this time.

173.    Yellowstone ignored this request.

174.    Coleman followed up in a text message on November 29, 2017, explaining that Y-CAPP had experienced an unexpected decrease in receivables.

> i know that you jave worked with me. we are rite there. we have added about 50 new students over the last few months but with the days out of school and holidays it has made us short. i didn't know we would only get 88k this week. im truing to get your mney and pay taxes and make payroll. i have to do all 3 to make sure the money still comes in. if i don't pay the taxes we are done, if i don't pay you we are done and if i don't pay payroll and insurance i don't have any one to work. im trying to get it.

175.    Coleman explained: "i have never made this little in 3 months. just look at the deposits."

176.    On December 1, 2017, Y-CAPP again requested a three-week suspension of payments, but Davis denied the request, stating: "We cannot do this I'm sorry. We missed last week and need 7500 this week or will take legal action. Guide yourself accordingly."

177.    Less than a week later, on December 4, 2017, Davis again demanded a $7,500 payment from Y-CAPP.

178.    Y-CAPP again explained to Davis that it did not have sufficient funds through the following text exchange with Davis:

> Davis:  We need payments to clear tomorrow to avoid legal action.  Please confirm they will clear for the 7500.
>
> Y-CAPP:  as of now we will not have the money.  Im still trying.  it will be next week before the money from the MIS numbers start to come in.  I know you will turn the case to legal.
>
> Davis:  How much you getting tomorrow?
>
> Y-CAPP:  184k…after payroll on Tuesday of 180k its only 4k remaining.  i moved payroll from Friday to Tuesday just so i can pay my people so they continue to work.  im trying to get you the other $3,500 to pay you, but I have [borrowed] from everyone.

179.    On December 5, 2017, Coleman was able to locate enough funds to make a $5,000 payment and asked for additional time to recover the remainder:

> Gm..i couldn't get any more from anyone but they paid us a little more and i transferred all we had to make payroll and leave $5k in the account. That is everything. you can see its getting better i just need more time and with the holidays coming its just gonna take a few more week but progress is happening. if its anything you can do to show them we are trying and its getting better. show tbem if they can hold off for a few more weeks before taken legal actions and take the 5k then they will get their money.

180.    Despite Coleman's pleas, Davis directed Yellowstone to remove $7,500 from Y-CAPP's account, prompting Coleman to tell Davis: "hey i see they took the 7500k. man dont let them shut us down over 2500. we are so close. i just need a few more weeks."

181.   Davis disregarded this plea, stating that the full $7500 was required or else.

182.   At 5:37 P.M. on December 5, 2017, Y-CAPP texted Davis informing him that it had just received another $720 check and that he would transfer the money in the morning.

183.   At 6:55 A.M. on December 6, 2017, Y-CAPP informed Davis that it had the payment's remaining balance.

184.   Upon receiving this information, Davis promptly sent Y-CAPP Yellowstone's wire transfer information.

185.   Incredibly, however, because Y-CAPP did not have sufficient funds to pay the $7,500 in full by December 5, 2017, Davis instructed MCA Recovery to obtain a judgment by confession against Y-CAPP, Coleman, and Pierce-Baylor totaling $613,746.13. In doing so, Weinstein submitted a false affidavit swearing under oath that Y-CAPP was in breach because it had blocked Yellowstone from debiting its account. Davis knew that representation was false and that the real reason was lack of receipts.

**E.   Yellowstone and its Employees Admit That its MCA Agreements are Loans**

186.   In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

187.   Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

188.   Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

189.   For example, Yellowstone advertises itself as follows:



190.    Yellowstone employees, including its owner, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

191.    While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

192.    In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

193.    Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

194.    The channel contains 15 videos.

195.    The actors in the videos were all employees of Yellowstone.

196.    The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

197.    One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[6]

198.    This video is titled "Bad Credit Business Loans $^{TM}$ | 855-445-9649." *Id.*

199.    The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account.  *Id.*  This video clearly targeted these loans for personal consumer use.

200.    Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me**.  So I went online and found Yellowstone Capital.  I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.**  It's crazy because my heartrate is higher than my credit score. So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse.  *Id.* (emphasis added).

201.    Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

202.     As the video played, subtitles described Yellowstone's MCA program:

> Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

> We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

> Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

---

[6] EZBusinessLoans, *Bad Credit Business Loans$^{TM}$ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**Our business loans** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **bad credit business loan** application today! *Id.* (emphasis added).

203.     These videos all link to a loan application Yellowstone's website. *Id.*

204.     On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[7]

205.     The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **a simple loan** is at your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com  *Id.* (emphasis added).

206.     Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

207.     Yellowstone's MCA program is also described as a loan by its employees on various other social media websites.

208.     Nathaniel Kingsley, marketing director for Yellowstone Capital, wrote an article titled: *How to Get Business Money Fast in the Face of Disaster.*

209.     In the article, Kinglsey described cash advances as follows:

Cash advances work as a sort of line of credit. You have access to a set amount, but if you only wind up needing several thousand, you only pay interest on the amount you used. The 'line of credit' model can prove especially helpful to a

---

[7] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

business rebuilding from disaster, as unforeseen costs associated with rebuilding can appear as you go.[8]

210.    On October 10, 2012, Yellowstone issued a press release describing a new starter advance program.[9]  In the press release, Mike Samuels, a seasoned representative for Yellowstone since 2009, states that Yellowstone's MCA is a line of credit: "[a]s long as you currently own a business and are generating revenue, … it's likely that we can find you funding. Structured properly, a starter advance can help to establish the same valuable line of credit that a standard merchant cash advance offers." *Id.*

211.    On May 12, 2015, Yellowstone posted an article on its blog titled: "Yellowstone Has the Options You Need to Stay Ahead of the Competition."[10]

212.    In the article, Yellowstone references one of its ISO reps, Juan Monegro, stating that Juan "knows firsthand just how valuable it can be to have access to the variety of options that Yellowstone offers.  He works with all sorts of deals, ranging from A and B paper deals to ones that are very high risk, even by C and D paper standards."  *Id.*  A, B, C, and D paper are references to the credit risk a lender takes based on a number of factors.

213.    The website Alignable.com launched in January 2014.  Alignable is a free network where small business owners build relationships and generate referrals.  Yellowstone advertises itself as "direct lender" on Alignable:[11]

---

[8] Nathaniel Kingsley, *How to Get Business Money Fast in the Face of Disaster,* First Class Business (Apr. 18, 2013), http://firstclassbusiness.org/how-to-get-business-money-fast-in-the-face-of-disaster (emphasis added).
[9] *Yellowstone Capital Extends Approvals for Starter Advances,* YELLOWSTONE CAPITAL(Oct. 10, 2012), http://m.yellowstonecap.com/press/release/yellowstone capital-first-to-fund-bank-only-ach-deals/24.

[10] *Yellowstone Has the Options You Need to Stay Ahead of the Competition*, YELLOWSTONE CAPITAL (Nov. 2, 2015), http://yellowstonecap.com/blog/yellowstone-has-options-you-need-stay-ahead-competition/.
[11] *Yellowstone Capital*, ALIGNABLE, https://www.alignable.com/jersey-city-nj/yellowstone-capital# (last visited Nov. 29, 2017).



214.    In 2013, Yellowstone employee, Steve Corlin, also admitted on his Facebook page that Yellowstone's MCAs are loans.   Corlin has been employed by Yellowstone from February 2011 to present.

215.    Specifically, on August 22, 2013, Corlin posted the following: "GET APPROVED   FOR   A   UNSECURED   BUSINESS   LOAN   24   HOURS   A DAY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

216.    Above   and   below   this   post   are   posts   relating   to   advertisements   about Yellowstone's business loans with links to Yellowstone's website.

217.    Corlin also has a linkedin page where he describes his postion at Yellowstone as a "Senior Loan Officer."   *Id.*   Corlin describes Yellowstone's services as follows:

> **The merchant cash advances that we offer are an unsecured business loan alternative.** The money that you get as part of your cash advance can be used for everything from renovation work to bringing in more stock. Our business cash advances are there for businesses of all sizes, and businesses from all different niches. If your business is starved of cash and the day to day running of it is nothing short of an impossible mission, you should think about applying for a cash advance in order to remove those financial constraints, **so your business can go on to become profitable and continue to grow once again**.[12]

---

[12] Steve Corlin, *Steve Corlin*, LinkedIn, https://www.linkedin.com/in/steve-corlin-a2b47966/ (last visited Nov. 29, 2017) (emphasis added).

218.    Fabio Giordano is a Funding Specialist for Yellowstone and has been employed

from March 2016 to present.  Giordano also admits Yellowstone is a direct lender:

> **I am a Direct Lender!**
> We Fund the UnBankable!
> I want your B-Z Paper![13]

219.    Simon Gould is a senior underwriter in Yellowstone's Funding Department, and

has been employed by Yellowstone from January 2010 to present.  On his LinkedIn page, Gould

admits Yellowstone is a direct lender:

> **<u>As a direct lender</u>** we work hard to secure funding and working capital for high
> risk small business and merchant cash advance deals short term up to 2 million.

Simon Gould, *Simon Gould*, LINKEDIN, https://www.linkedin.com/in/simon-gould-67171065/

(last visited Nov. 29, 2017) (emphasis added).

220.    Dawanna Terry is employed by Yellowstone as a Senior Financial Analyst.  Terry

has worked for Yellowstone from April 2015 to present.

221.    Terry describes her position and responsibilities at Yellowstone as follows:

"**<u>Process Financial Loans</u> For Business To Promote More Working Capital ...**"[14]

222.    DeBanked.com is a website dedicated to the MCA industry.  DeBanked.com has a

forum where users can advertise and/or solicit services.

223.    Yeyfri Garcia is employed by Yellowstone as a Senior Funding Specialist and

Senior Member of ISO Development.

224.    On May 12, 2017, a Yellowstone employee posted in a forum on DeBanked.com:

> We believe that EVERY DEAL IS FUNDABLE!! – even high risk deals. **With
> all of our new benefits we almost GUARANTEE your <u>loan approval</u>. We can
> get you approved in less than 24 hours.**[15]

---

[13] Fabio Giordano, *Fabio Giordano*, LinkedIn, https://www.linkedin.com/in/fabio-giordano-5bb06713b/ (last visited Nov. 29, 2017).
[14] Dawanna Terry, *Dawanna Terry*, LinkedIn, https://www.linkedin.com/in/dawanna-terry-341186b9/ (last visited Nov. 29, 2017) (emphasis added).

225.    Jay Marte is employed by Yellowstone.  Marte also referred to Yellowstone as a "direct lender" that offered 1st-10th position funding and prepay discounts for merchants.[16]

226.    Defendant Stern likewise admitted that Yellowstone is a lender in one of his posts on DeBanked.com.  In an advertisement for an underwriting position, Stern stated that Yellowstone is "[s]eeking an experienced Underwriter in the Small Business Lending space."[17]

## H.    Damages

227.    Y-CAPP was essentially trapped by a common tactic used by predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

228.    As a direct and proximate result of each of the loans, Y-CAPP paid interest in excess of the 25% maximum interest rate permitted by New York law.

229.    As a direct and proximate result of each of these loans, Y-CAPP and its owners have been harassed, and have been forced to defend against Yellowstone's fraudulent judgment.

## FIRST CAUSE OF ACTION

### (RICO:  18 U.S.C. § 1962)

230.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

## A.    The Criminal Activity.

231.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

---

[15] Ygarcia29, *Become an ISO With Our Company!!*, DeBanked (May 12, 2017, 2:19 PM), https://debanked.com/forums/ showthread.php/1182-Become-an-ISO-with-our-company!!.

[16] Jormanm, *Direct Lend Paying Great Offers For All ISOs*, DEBANKED (April 5, 2017, 12:32 PM), https://debanked.com/forums/show thread.php/1131-Direct-lender-paying-great-offers-for-all-ISOs?p=4847.

[17] Isaacdstern, *Yellowstone Capital / Fundry Seeks MCA Experienced Underwriter*, DEBANKED (Nov. 2, 2015 1:01 PM), http://debanked.com/forums/showthread.php/623-Yellowstone-Capital-Fundry-seeks-MCA-experienced-underwriter.

232.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

233.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

234.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

235.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

236.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

237.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

238.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

239.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

240.    The MCA industry is the modern day version of loansharking and their use of so-called "factoring" agreements are mere cover for the true nature of these transactions.

**B.      The Legitimate Enterprises.**

241.    Yellowstone, Arch, Everest, HSC (collectively the "Stern MCA Companies"), and MCA Recovery comprise the Legitimate Enterprise.  Defendants used the legal functions of these companies as a front to conduct their illegal loansharking activities.

242.    While these companies serve a legitimate business purpose by providing and collecting high-interest loans to small businesses located in states without usury laws or collecting payments on same, the Legitimate Enterprise is used to issue and collect upon illegal loans in states that have usury laws.

243.    In order to disguise this criminal conduct, the Stern Organization uses the auspice of a so-called factoring agreement.  In other words, Defendants use the nominally legitimate business practice of factoring to disguise their loan-sharking enterprise.

244.    The legal activities of the Legitimate Enterprises function separate and apart from the illegal activities that function to serve the purpose of the Stern Organization.

**C.      The Stern Organization.**

245.    Yellowstone, Arch, Everest, HSC, MCA Recovery, Stern, Davis, Weinstein, and the John and Jane Doe Investors form the Influencing Enterprise.

246.    The Stern Organization is an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact.

247.    The Stern Organization is an organization whose members and associates derive income through the "collection of unlawful debt," as defined in Title 18, United States Code, Section 1961(6), that is, "a debt (A) ... which is unenforceable under State ... law in whole or in

part as to the principal or interest because of the laws relating to usury, and (B) which was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State ... law, where the usurious rate is at least twice the enforceable rate."

248.    The Stern Organization constitutes an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

249.    Although Defendants do not form a legal entity, the members of the Influencing Enterprise are associated-in-fact.

### D.    The Purpose of the Enterprise.

250.    It is the purpose of the Stern Organization to obtain money for its members and associates through the collection of unlawful debt, that is, debt which was unenforceable in various states, including New York (the center of its collection efforts) because the debt arose from criminally usurious loans.

251.    It is also a purpose of the Stern Organization to maintain and expand the profits of the enterprise through the reinvestment of moneys received from the collection of unlawful loans into the enterprise.

### E.    The Racketeering Conspiracy.

252.    From at least 2012 to the present, Defendants and others being persons employed by and associated with the Stern Organization, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Stern Organization through the collection of unlawful debt, as that term is defined by 18 U.S.C. § 1961(6).

41

253.    The collection of unlawful debt through which Defendants agreed to conduct and participate (directly and indirectly, in the conduct of the affairs of the enterprise), consisted of the collection of debts which were unenforceable under the laws of New York and other States in whole and in part as to principal and interest and which were incurred in connection with the business of lending money at a rate usurious under the laws of New York and other States where the usurious rate is at least twice the enforceable rate.

254.    Defendants each are persons under 18 U.S.C. § 1961(3) because they are individuals or entities capable of holding a legal or beneficial interest in property.

255.    The Influencing Enterprise is a group of individuals and corporations associated in fact, since at least 2012, for the common purpose of funding, issuing, and collecting on usurious loans to Plaintiffs and countless other small businesses.  Thus, the associated-in-fact organization qualifies as an enterprise within the meaning of § 1961(4) and § 1962(c).

256.    Thus, the associated-in-fact organization qualifies as an enterprise within the meaning of § 1961(4) and § 1962(c).

257.    It was part of the conspiracy that Defendants agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

**F.    The Manner and Means.**

258.    Collectively, Defendants engaged in an unlawful scheme to induce businesses and their principals to enter into, and make payments on, criminally usurious loans that the Stern Organization knew would lead to subsequent criminally usurious loans.

259.    Stern is the mastermind of the Stern Organization.

260.    From at least 2012 to the present, Stern personally, in furtherance of the Stern Organization's purpose, (1) conspired with Arch, Everest, HSC and MCA Recovery to take

actions to further the purpose of the Stern Organization; (2) recruited investors to fund the criminally usurious loans; (3) solicited brokers to advertise, sell and sometimes fund the criminally usurious loans; (4) solicited other MCA companies to further the purpose of the Stern Organization by funding loans that were generated through Yellowstone's network of Independent Sales Offices; (5) used the illegal profits from the criminally usurious loans to fund new criminally usurious loans; (6) directed the day-to-day affairs of the Stern Organization; and (7) executed legal documents on behalf of the Stern Organization entities.

261.    From at least 2012 to the present, Davis personally, in furtherance of the Stern Organization's purpose, (1) solicited and induced merchants to enter into the criminally usurious loans; (2) collected upon the unlawful debts when a merchant failed to pay; (3) used threats of economic harm and personal financial disaster to collect upon the unlawful debts; (4) used the illegal profits from the criminally usurious loans to fund new criminally usurious loans; (5) recruited investors to fund the criminally usurious loans; (6) solicited brokers to advertise, sell and sometimes fund the criminally usurious loans; (7) acted as a broker for many of the criminally usurious loans; (8) solicited other MCA companies to fund criminally usurious loans in order to ensure the Stern Organization's loans get paid first; (9) underwrote the criminally usurious loans; and (10) executed legal documents on behalf of the Stern Organization entities.

262.    From at least 2012 to the present, Weinstein personally, in furtherance of the Stern Organization's purpose, (1) collected upon the unlawful debts when a merchant failed to pay; (2) used threats of economic harm and personal financial disaster to collect upon the unlawful debts; and (3) executed legal documents on behalf of the Stern Enterprise entities.

263.    In order to advance the purpose of the Stern Organization, Defendants use the same or similar sham agreements, which purport to be the "Purchase and Sale of Future Receivables," to disguise their criminally usurious loans.

264.    As detailed above, the transactions were not true sales or purchases of receivables. The Stern Organization did not assume any risk of loss.  The money advanced was absolutely repayable. And the Stern Organization has ensured that the monies advanced will be repaid absolutely by requiring the merchants to execute a Security Agreement and Guarantee, as well as an Affidavit Confessing Judgment.

265.    When the merchants cannot pay, the Stern Organization uses a company that is separate and apart from the Stern MCA Companies, MCA Recovery, and obtains a judgment by confession.

266.    After MCA Recovery obtains a judgment, the Stern Organization then uses another entity that is separate and apart from the Stern MCA Companies by using Barbarovich to issue a levy and demand to collect upon the unlawful debt under the guise of his authority granted by the New York City Marshall's Office.

267.    Since 2012, the Stern Organization has generated hundreds of millions of dollars in revenues, from which Stern has received millions of dollars in ill-gotten profits.

268.    All of these ill-gotten profits were obtained in violation of 18 U.S.C. § 1962(d).

**G.    The RICO Predicates.**

269.    Defendants have violated 18 U.S.C. § 1962(c) and (d) by engaging in loansharking through wire fraud and collecting, and conspiring to collect, an unlawful debt.

44

270.    The Influencing Enterprise is engaged in interstate commerce as it has had business dealings with others, such as Plaintiffs, who operate in states where no Defendant resides.

271.    Defendants knowingly and intentionally used the Legitimate Enterprise to fund, issue, and collect on unlawful loans that charged interest rates that are more than twice the interest rate permitted under New York's criminal usury statute.

272.    Defendants are associated with, and/or employed by, the Influencing Enterprise as they serve various functions for the Influencing Enterprise including, but not limited to:

    a.    The John and Jane Doe Investors conspired with Stern and Davis to fund the usurious loans;

    b.    Yellowstone, Arch, Everest and HSC entered into, and collected upon, the loans with Y-CAPP;

    c.    Yellowstone, Arch, Everest and HSC were directed by Davis to enter into the usurious loans;

    d.    MCA Recovery, under the direction of Davis, attempted to collect upon the usurious loans by issuing obtaining a judgment against Y-CAPP.

273.    The collection of these unlawful debts constitutes a *per se* violation of 18 U.S.C. § 1962(c).

274.    Defendants exhaust every possible avenue to collect the unlawful debt, including:

    a.    Yellowstone's, Arch's, Everest' and HSC's collection of Plaintiffs' aforementioned daily wire payments between June 2012 and March 2018;

    b.    Collection calls, texts, and emails by the Stern Organization, through Davis, between June 2012 and March 2018.

    c.    MCA Recovery's entry of Y-CAPP's, Coleman's and Pierce-Baylor's confessions of judgment on behalf of Yellowstone.

275.    The debt that Defendants collected or attempted to collect is unlawful because (1) it violates the criminal usury statutes of New York and Florida, and (2) the rates are more than twice the legal rate.

276.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c) and (d), Plaintiffs have suffered, and continue to suffer, substantial injury by paying criminally usurious interest and having to defend against a judgment fraudulently obtained by the Stern Organization.

277.    Further, Defendants conspired amongst themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in, directly and indirectly, the conduct of the affairs of the Influencing Enterprise and by collecting upon an unlawful debt.

278.    Defendants committed and caused to be committed a series of overt acts in furtherance of their conspiracy, including, but not limited to, those acts detailed herein.

279.    Among these predicate acts, Defendants violated N.Y. Penal Law § 190.40, Florida Statutes § 687.03 and/or 18 U.S.C. § 1341.

280.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered, and continue to suffer, substantial injury to their business as they were forced to pay usurious amounts of interest, and make substantial withdrawals from personal accounts to aid in repayment.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

### As to Defendants Yellowstone, Arch, and HSC only

281.     Plaintiffs repeat and re-allege the allegations set forth above herein.

282.     Section 1.9 of the Yellowstone and Arch agreements provides:  "In the event that a court nonetheless determines that [Yellowstone] has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate allowed by applicable law and [Yellowstone] shall promptly refund to Merchant any interest received by [Yellowstone] in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that [Yellowstone] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

283.     Section 1.8 of the HSC agreements provide similar language.

284.     As detailed above, each of the MCA agreements that Yellowstone, Arch and HSC entered into with Y-CAPP was a loan transaction.

285.     Y-CAPP has paid and, Yellowstone, Arch and HSC have received, interest in excess of the maximum criminal usury interest rate allowed under and New York law.

## THIRD CAUSE OF ACTION

### (Fraud)

286.     Plaintiffs repeat and re-allege the allegations set forth above herein.

**A.     Fraud Concerning True Nature of Transaction**

287.     Defendants conspired to intentionally misrepresent the true nature of the transactions in order to avoid application of the criminal usury laws of Florida and New York.

288.   Defendants misrepresented, via wire transfers and text messages, that the MCA agreements were enforceable when they are illegal under Florida and New York law.

289.   Defendants collected on contracts that are illegal in Florida and New York.

290.   Collecting on illegal contracts creates the false impression that the MCA loans are enforceable and that Y-CAPP is obligated to repay when it is not.

291.   This false impression is material, and Plaintiffs did not reasonably know that the contracts were illegal. Had Y-CAPP known that the contracts were unlawful, they never would have entered into them in the first place, nor would they have made payments thereunder.

292.   Defendants further knowingly misrepresented the nature of the fees charged in connection with the funds advanced under the MCA loans.

293.   Defendants knew that the representations were false at the time made.

294.   Defendants made these representations with the intent to deceive Plaintiffs, and with the intent to avoid the criminal usury laws.

295.   Plaintiffs reasonably relied upon these representations to its determent by entering into the loans and by paying principal, interest and fees on loans that are illegal and unenforceable.

296.   Plaintiffs were directly and proximately damaged by these knowingly false representations by paying interest, principal and fees on criminally usurious loans for which they had no legal obligation to repay.

297.   Defendants' conduct was intentional, outrageous and in reckless disregard of Plaintiffs' rights.

B.      **Fraud Concerning the Judgment**

298.     On December 12, 2017, at the direction of Davis, Weinstein signed an affidavit representing under oath that Y-CAPP had breached the terms of the MCA agreement with Yellowstone by "blocking [Yellowstone's] access to the Account and by preventing [Yellowstone] from debiting the Account per the Agreement."

299.     Weinstein also represented under oath that the "Personal Guarantees provide that in the event of [Y-CAPP's] default under any of the terms of the Agreement, including blocking ACH debits or depositing their accounts-receivable into a bank account other than the Account, [Yellowstone] may enforce its rights against [Y-CAPP] under the Agreement against [] Jonathan, and [] Donna, without first seeking recourse from [Y-CAPP]."

300.     The first statement was false because Y-CAPP never instructed its bank to block Yellowstone's access to its account.  Nor did Y-CAPP take any action to prevent Yellowstone from debiting the Account.  Davis knew this representation was false because Y-CAPP had repeatedly informed him that Y-CAPP did not have sufficient funds in the Account to make the weekly payment that Davis demanded to be paid by December 5, 2017.

301.     In fact, Y-CAPP specifically told Davis that it not have sufficient funds by text:

We need payments to clear tomorrow to avoid legal action. Please confirm they will clear for the 7500



as of now we will not have the money. Im still trying. it will be next week before the money from the MIS numbers start to come in. I know you will turn the case to legal

302.     The second statement was knowingly false because the Personal Guarantee does not permit Yellowstone to enforce the Personal Guarantee in the event of Y-CAPP's "default

under any *terms* of the Agreement." Instead, the Personal Guarantee is limited to Y-CAPP's performance of "all of the *representations, warranties, covenants* made by Merchant in this Agreement and the Merchant Agreement." The Weinstein Affidavit does not allege that Y-CAPP breached a single representation, warranty or covenant, and Davis knew that Y-CAPP had not breached any representation, warranty or covenant.

303.    Despite knowing that these representations were false, Davis directed MCA Recovery to file and obtain a judgment by confession against Plaintiffs.

304.    On December 5, 2017, MCA Recovery filed the Weinstein Affidavit in support of the judgment by confession.

305.    On information and belief, the Clerk of Erie County, New York relied upon the knowingly false representations contained in the Weinstein Affidavit.

306.    On information and belief, but for these knowingly false representations, the Clerk of Erie County, New York would not have entered judgment against Plaintiffs.

307.    Despite knowing that judgment had been entered against Y-CAPP, Davis did not even tell Y-CAPP that the Stern Organization had obtained a judgment against Y-CAPP.

308.    The very next day, Y-CAPP informed Davis that it had the full $7,500 payment demanded by Davis and asked for wiring instructions.

309.    Davis acted as though nothing had happened and continued to induce Y-CAPP into making additional weekly payments even after judgment had been entered against Y-CAPP.

310.    On December 14, 2017, Y-CAPP asked Davis why its account was charged $122,000. Davis outright lied to Y-CAPP, representing that he did not know what the charge was for and that no action would be taken as long as Y-CAPP continued to make the $7,500 weekly payments demanded by Davis.

311.    On December 15, 2017, Y-CAPP again asked Davis about the $122,000 charge. Again, Davis lied to Y-CAPP, representing that "those get added for default fees.  If everything goes smooth and we get back on track we will remove it.  Don't worry about that now."

312.    On December 27, 2017, Y-CAPP received a Restraining Notice from MCA Recovery that purported to restrain all of Y-CAPP's funds.  Again, Davis told Y-CAPP not to worry about it.

313.    Plaintiffs were directly and proximately damaged by these knowingly false representations by having a fraudulent judgment entered against them by the Clerk of Erie County, New York.

314.    The conduct by Davis and Weinstein was intentional, outrageous and in reckless disregard of Plaintiffs' rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

    a)    Declaring each of Plaintiffs' agreements with each of the Defendants to be void and unenforceable;

    b)    Permanently enjoining Defendants from engaging in the illegal conduct described above, including entering into or collecting on any further usurious loan agreements;

    c)    Awarding Plaintiffs compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined a trial;

    d)    Awarding punitive damages and/or treble damages as the Court deems appropriate;

    e)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

    f)    Granting such other and further relief as this Court deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues properly so tried.


Dated:  April 12, 2018

**WHITE AND WILLIAMS LLP**

By:_____

Shane R. Heskin
Justin E. Proper
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*