**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE NEW Y-CAPP INC.; JONATHAN EUGENE COLEMAN; DONNA ZEMORIA PIERCE-BAYLOR; RADIANT IMAGES, INC. AND GIANNA WOLFE, individually on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>ARCH CAPITAL FUNDING, LLC; HIGH SPEED CAPITAL, LLC; YELLOWSTONE CAPITAL, LLC; YELLOWSTONE CAPITAL WEST, LLC; TSVI H. DAVIS; YITZHAK D. STERN; AND THE JOHN AND JANE DOE INVESTORS,<br><br>       Defendants. | Docket No.:  1:18-cv-03223-ALC<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND DEMAND FOR A TRIAL BY JURY

  Plaintiffs The New Y-CAPP, Inc. ("Y-CAPP"), Jonathan Eugene Coleman ("Coleman"),

Donna Zemoria Pierce-Baylor ("Pierce-Baylor"), Radiant Images, Inc. ("Radiant"), and Gianna

Wolfe ("Wolfe"), by and through their undersigned attorneys, individually and on behalf of all

others similarly situated, allege as against Defendants as follows:

## NATURE OF THE ACTION

  1.  This is an action to save small businesses across the country from the predatory

lending practices of Defendants.

  2.  Plaintiff Y-CAPP is an organization that provides behavioral healthcare services

to local children and adults in Richmond, Virginia who are in dire need of social services.

3.     Plaintiff Radiant is an award-winning service provider to the motion-picture industry located in Los Angeles, California.

4.     Defendants Yellowstone Capital, LLC ("Yellowstone"), Yellowstone Capital West, LLC ("YCW"), Arch Capital Funding, LLC (Arch"), and High Speed Capital, LLC ("HSC"), which are led and/or directed by Defendants Tsvi Davis and Yitzhak Stern, are a four of a growing number of merchant cash advance ("MCA") companies whose entire scheme preys upon struggling small businesses (collectively with MCA Recovery, LLC, the "Enterprise").

5.     The Enterprise provides funds to Plaintiffs, and other small businesses, through what it calls MCA agreements or factoring agreements. In actuality, these agreements are unquestionably loans.  The Enterprise, however, cannot call these transactions what they are (loans) because the whole point of its scheme is to avoid the usury laws of various states, including New York.  Thus, in order to charge the unlawful and unconscionable interest rates they seek to impose, the Enterprise must call them by a different name.

6.     The scheme is designed to drain the small businesses so they have to take out additional loans at the same or even worse interest rates.

7.     Despite the form of the transaction, the money advanced is absolutely repayable. Indeed, as Yellowstone admitted in its recent pleading before this Court, "hardship" is not a defense to a merchant's payment obligation under any applicable law.

8.     Because these small business victims must make fixed payments, the Enterprise knows that in order for its victims to pay the usurious interest rates charged, the victims will have to enter into additional usurious loans with the Enterprise or other MCA companies.

9.     In fact, Yellowstone recently admitted in a pleading before this Court that "it is common in the industry, and it has been the experience of [Yellowstone], that merchants seek to

(and do) renew and/or seek additional Merchant Cash Advance Agreements," and that these "renewals…are an important source of revenue for [Yellowstone]."

10.     The foreseeable consequences of the Enterprise's actions are the devastation of small businesses all across the country, which are the backbone of our economy.

11.     To be sure, since just 2016, the Enterprise has obtained judgments by confession against more than 5,000 small businesses and their individual owners because they could not keep up with the predatory terms of their criminally usurious agreements.

12.     The pervasive extent of Defendants' unlawful conduct is indicative of the growing epidemic that is threating our nation's economy.

## THE PARTIES

13.     Plaintiff The New Y-CAPP, Inc. is a corporation duly organized under the laws of Virginia with its principal place of business located in Richmond, Virginia.

14.     Plaintiff Jonathan Eugene Coleman is an individual citizen and an adult resident Chesterfield, Virginia.

15.     Plaintiff Donna Zemoria Pierce-Baylor is an individual citizen and an adult resident of Midlothian, Virginia.

16.     Plaintiff Radiant Images Inc, is a corporation organized and existing under the laws of California, with a principal place of business located at 2702 Media Center Drive, Los Angeles, CA 91016.

17.     Plaintiff Gianna Wolfe is the co-Founder of Radiant Images, Inc., and an adult resident and citizen of Los Angeles, California.

18.     Defendant Arch Capital Funding, LLC is a limited liability company organized under the laws of New York with a principal place of business at 160 Pearl Street, New York,

3

NY 10005.  On information and belief, each of its LLC members is a citizen of New York or California.

19.     Defendant MCA Recovery, LLC, is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 17 State Street, Suite 4000, New York, New York 10004.  On information and belief, each of its LLC members is a citizen of New York or New Jersey.

20.     Defendant High Speed Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  On information and belief, each of its LLC members is a citizen of Delaware, New York or New Jersey.

21.     Defendant Yellowstone Capital, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at One Evertrust Plaza, Jersey City, New Jersey 07302.  Its LLC members are citizens of Delaware, New Jersey and/or New York.

22.     Defendant Yellowstone Capital West, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 1 Evertrust Plaza, Jersey City, New Jersey 07302.

23.     Defendant Tsvi H. Davis (a.k.a Steve Davis) is an adult resident and citizen of New York who resides at 2201 Avenue M, Brooklyn, NY 11210.

24.     Defendant Yitzhak D. Stern (a.k.a. Isaac Stern) is an adult resident and citizen of New Jersey who resides at 220 Surrey Rd., Hillside, NJ 07205.

25.     The John and Jane Doe Investors are individuals who have provided capital to fund the criminally usurious loans and to help further the illegal purpose of the Enterprise.  On

information and belief, each of the John and Jane Doe Investors are citizens of Delaware, Florida, New Jersey or New York.

## **JURISDICTION**

26.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

28.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

29.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

30.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

31.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

32.     Venue is proper because each Defendant regularly conducts business within this judicial district.

5

## COMMON FACTUAL ALLEGATIONS

### A.   The Predatory MCA Industry

33.   As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

34.   The National Consumer Law Center expressed the same payday lending concerns:

> Merchant cash advances operate very similarly to payday loans and have similar problems.  A lump sum of cash is taken out as an advance on a borrower's future sales.  The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[4]

35.   As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[5]

36.   The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*
[4] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf.
[5] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[6]

37.     The New York Attorney General's Office has also acknowledged the damage these loans cause, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay." [7]

38.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.  National Consumer Law Center, *supra*.

39.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

40.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

---

[6] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.
[7] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

B.      **The Yellowstone Umbrella**

41.     Yellowstone was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room," while he was still on probation for insider trading.

42.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."

43.     Defendant Stern, the CEO of Yellowstone, is David Glass' brother-in-law.

44.     Just like the movie, Yellowstone utilizes high pressure boiler room tactics by employing salespersons with absolutely no financial background whatsoever.

45.     In fact, Yellowstone's number one funder, who is dubbed "the Closer," has no financial experience whatsoever.  Rather, his apparent expertise came from working for Verizon, as a customer sales representative.  He now generates over $47 million in funding a year.[8]

46.     Stern actively solicits and recruits these boiler room salespersons on his personal social media websites.

47.     Although many of these high pressure sales pitches use the promise of helping these small businesses grow, in reality, all they do is fatten the pockets of the MCA companies

48.     Since being founded in 2009, Yellowstone has expanded its umbrella to include numerous other MCA companies that operate under its management and control but exist under other corporate names.  These MCA companies include Arch, Capital Merchant Services, LLC, HSC, World Global Capital, LLC, Green Capital Funding, LLC, Merchant Funding Services, Corp, and YCW.  Most of these other MCA companies use the same location of 30 Broad Street, 14th Floor, New York, NY 10004 on their contracts but are actually operated out of Yellowstone's headquarters at 1 Evertrust Plaza, Jersey City, New Jersey 07302.

---

[8]  deBanked, The Closer – Meet the Yellowstone Capital Rep that Originated $47 Million in Deals Last Year, dated Feb. 10, 2016.

49.     Although each of these MCA entities operate out of New Jersey, they are strategically organized under the laws of New York so that they can utilize New York's confession of judgment statute and post-judgment collection devices.

50.     In addition to its fleet of MCA companies, Yellowstone utilizes a vast network of Independent Sales Offices and brokers to sell their criminally usurious loans.

51.     In 2017, Yellowstone and its related companies issued over $400 million in loans.

**C.      Yellowstone and its Employees Admit That its MCA Agreements are Loans**

52.     In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

53.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

54.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans.

55.     To this day, Yellowstone targets small businesses in need of "a loan":



56.     Yellowstone employees, including, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

57.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

58.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

59.     Yellowstone created a channel for the videos, which it called EZBusinessLoans. EZBusinessLoans, *EZBusinessLoans*, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

60.     The actors in the videos were all employees of Yellowstone.

61.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

62.     One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz, a.k.a., Dynamite Disco Danny.[9]

63.     This video is titled "Bad Credit Business Loans [TM] | 855-445-9649." *Id.*

64.     The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account.  *Id.*  This video clearly targeted these loans for personal consumer use.

65.     Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me**.  So I went online and found Yellowstone Capital.  I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.**  It's crazy because my heartrate is higher than my credit score.

---

[9] EZBusinessLoans, *Bad Credit Business Loans [TM] | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse. *Id.* (emphasis added).

66.     Below the video is the following link: "CLICK HERE TO APPLY!

http://www.yellowstonecap.com/FundsToday." *Id.*

67.     As the video played, subtitles described Yellowstone's MCA program:

Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**

We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their **<u>bad credit business loans</u>** in as little as three days.

Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**

Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.

**<u>Our business loans</u>** are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **<u>bad credit business loan</u>** application today!  *Id.* (emphasis added).

68.     These videos all link to a loan application Yellowstone's website. *Id.*

69.     On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[10]

70.     The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **<u>a simple loan</u>** is at

---

[10] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com *Id.* (emphasis added).

71.     Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**

72.     Yellowstone's MCA program is also described as a loan by its employees on various other social media websites.

73.     For example, Nathaniel Kingsley, marketing director for Yellowstone Capital, wrote an article titled: *How to Get Business Money Fast in the Face of Disaster.*

74.     In the article, Kinglsey described cash advances as follows:

Cash advances work as a sort of line of credit. You have access to a set amount, but if you only wind up needing several thousand, you only pay interest on the amount you used. The 'line of credit' model can prove especially helpful to a business rebuilding from disaster, as unforeseen costs associated with rebuilding can appear as you go.[11]

75.     On October 10, 2012, Yellowstone issued a press release describing a new starter advance program.[12] In the press release, Mike Samuels, a seasoned representative for Yellowstone since 2009, states that Yellowstone's MCA is a line of credit: "[a]s long as you currently own a business and are generating revenue, … it's likely that we can find you funding. Structured properly, a starter advance can help to establish the same valuable line of credit that a standard merchant cash advance offers." *Id.*

76.     On May 12, 2015, Yellowstone posted an article on its blog titled: "Yellowstone Has the Options You Need to Stay Ahead of the Competition."[13]

---

[11] Nathaniel Kingsley, *How to Get Business Money Fast in the Face of Disaster,* First Class Business (Apr. 18, 2013), http://firstclassbusiness.org/how-to-get-business-money-fast-in-the-face-of-disaster (emphasis added).

[12] *Yellowstone Capital Extends Approvals for Starter Advances,* YELLOWSTONE CAPITAL(Oct. 10, 2012), http://m.yellowstonecap.com/press/release/yellowstone capital-first-to-fund-bank-only-ach-deals/24.

[13] *Yellowstone Has the Options You Need to Stay Ahead of the Competition*, YELLOWSTONE CAPITAL (Nov. 2, 2015), http://yellowstonecap.com/blog/yellowstone-has-options-you-need-stay-ahead-competition/.

77.     In the article, Yellowstone references one of its ISO reps, Juan Monegro, stating that Juan "knows firsthand just how valuable it can be to have access to the variety of options that Yellowstone offers.  He works with all sorts of deals, ranging from A and B paper deals to ones that are very high risk, even by C and D paper standards."  *Id.*  A, B, C, and D paper are references to the credit risk a lender takes based on a number of factors.

78.     The website Alignable.com launched in January 2014.  Alignable is a free network where small business owners build relationships and generate referrals.  Yellowstone advertises itself as "direct lender" on Alignable:[14]



79.     In 2013, Yellowstone employee, Steve Corlin, also admitted on his Facebook page that Yellowstone's MCAs are loans.  Corlin has been employed by Yellowstone from February 2011 to present.

80.     Specifically, on August 22, 2013, Corlin posted the following: "GET APPROVED FOR A UNSECURED BUSINESS LOAN 24 HOURS A DAY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

---

[14] *Yellowstone Capital*, ALIGNABLE, https://www.alignable.com/jersey-city-nj/yellowstone-capital# (last visited Nov. 29, 2017).

81.     Above and below this post are posts relating to advertisements about Yellowstone's business loans with links to Yellowstone's website.

82.     Fabio Giordano is a Funding Specialist for Yellowstone and has been employed from March 2016 to present.  Giordano also admits Yellowstone is a direct lender:

> **I am a Direct Lender!**
> We Fund the UnBankable!
> I want your B-Z Paper![15]

83.     DeBanked.com is a website dedicated to the MCA industry.  DeBanked.com has a forum where users can advertise and/or solicit services.

84.     Yeyfri Garcia is employed by Yellowstone as a Senior Funding Specialist.

85.     On May 12, 2017, a Yellowstone employee posted in a forum on DeBanked.com:

> We believe that EVERY DEAL IS FUNDABLE!! – even high risk deals. **With all of our new benefits we almost GUARANTEE your <u>loan approval</u>. We can get you approved in less than 24 hours.**[16]

86.     Jay Marte is employed by Yellowstone.  Marte also referred to Yellowstone as a "direct lender" that offered 1st-10th position funding and prepay discounts for merchants.[17]

87.     Stern likewise admitted that Yellowstone is a lender in one of his posts on DeBanked.com. In an advertisement for an underwriting position, Stern stated that Yellowstone is "[s]eeking an experienced Underwriter in the Small Business Lending space."[18]

---

[15] Fabio Giordano, *Fabio Giordano*, LinkedIn, https://www.linkedin.com/in/fabio-giordano-5bb06713b/ (last visited Nov. 29, 2017).
[16] Ygarcia29, *Become an ISO With Our Company!!*, DeBanked (May 12, 2017, 2:19 PM), https://debanked.com/forums/ showthread.php/1182-Become-an-ISO-with-our-company!!.

[17] Jormanm, *Direct Lend Paying Great Offers For All ISOs*, DEBANKED (April 5, 2017, 12:32 PM), https://debanked.com/forums/show thread.php/1131-Direct-lender-paying-great-offers-for-all-ISOs?p=4847.

[18] Isaacdstern, *Yellowstone Capital / Fundry Seeks MCA Experienced Underwriter*, DEBANKED (Nov. 2, 2015 1:01 PM), http://debanked.com/forums/showthread.php/623-Yellowstone-Capital-Fundry-seeks-MCA-experienced-underwriter.

14

**D.      The Enterprise Intentionally Disguised the True Nature of the Transaction.**

88.      Despite its documented form, the transactions are, in economic reality, a loan that

was absolutely repayable.  Among other hallmarks of a loan:

(a)      The Daily/Weekly Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)      The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.   The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)      While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)      The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)      The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)      The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the

Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## FACTS SPECIFIC TO PLAINTIFF RADIANT

### A.     Radiant Images, Inc. and Wolfe.

89.     Radiant Images is an award-winning service provider to the motion-picture industry located in Los Angeles, California.  For more than 10 years, it has provided motion-picture companies with 2D, 3D, VR, and augmented reality solutions and access to various specialized equipment through its rental services.

90.     Radiant is owned and operated by Wolfe.

### B.     The Enterprise Loans.

91.     In early 2016, Radiant was suffering financial difficulties and needed financing.

92.     On March 30, 2016, Radiant obtained a loan from YCW.

93.     At the time of the transaction, YCW was licensed to provide loans in California, and under then existing California law, YCW was exempt from the California usury laws.

94.     Accordingly, YCW was honest and called the transaction what it was—a loan:

**LOAN TERMS**

For value received, Borrower hereby promises to pay to YCW the principal amount specified below ("Loan Amount"), plus interest, in lawful money of the United States. Borrower shall deliver the principal and interest amount specified below (the "Repayment Amount") to YCW from the payment of monies from Borrower's customers and/or other third party (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Borrower's business), for the payment of Borrower's sale of goods or services.

The Repayment Amount shall be paid to YCW by Borrower's irrevocably authorizing only one depositing account acceptable to YCW (the "account") to remit the percentage specified below (the "Specified Percentage") of the Borrower's settlement amounts due from each transaction, until such time as YCW receives payment in full of the Repayment Amount. Borrower hereby authorizes YCW to ACH Debit the specified remittances from the Borrower's bank account on a daily basis and will provide YCW with all required access codes.  Borrower understands that it is responsible for ensuring that the specified percentage to be debited by YCW remains in the account and will be held responsible for any fees incurred by YCW resulting from a rejected ACH attempt or an event of default.  (See Appendix A). YCW is not responsible for any overdrafts or rejected transactions that may result from YCW's ACH debiting the specified amounts under the terms of this Agreement. YCW will debit the specific daily amount each business day and upon receipt of the Borrower's monthly bank statements to reconcile the Borrower's account by either crediting or debiting the difference from or back to the Borrower's bank account so that the amount debited per month equals the Specified Percentage. It is solely the Borrower's responsibility to send all their bank statements and a missed month forfeits all future reconciliations. YCW may, upon Borrower's request, extend the time for any payment due under this Agreement for such time as YCW, in its sole discretion, deems appropriate.  Notwithstanding anything to the contrary in this Agreement or any other agreement between YCW and Borrower, upon the occurrence of an Event of Default under Section 4 of the LOAN AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.

Loan Amount: $ __140,000.00__   Specified Percentage: _____ %   Specific Daily Amount: $ _1,575.00_   Repayment Amount: $ __189,000.00__

95.     Pursuant to the loan, YCW advanced $140,000 to Radiant in exchange for the repayment of $189,000 through 120 fixed daily payments of $1,575.  *See* Ex. 1.

96.     Thus, at the inception of the loan, YCW anticipated repayment within a specified term determined by the number of daily payments required for full repayment.

97.     To secure performance of the daily payments, Radiant granted YCW a security interest in certain of its assets and Wolfe was required to personally guarantee Radiant's performance of the representations, warranties and covenants under the loan.

98.     Radiant paid off the loan in full just as required by the loan terms.

99.     In July 2018, Radiant was again in dire financial need of a loan in order to keep up with another MCA loan that Radiant entered into with Queen Funding, LLC ("Queen").

100.    In or around that time, Radiant was approached by Jay Baron ("Baron") of Blue Rock Capital Solutions.

101.    As Director of Finance, Baron offered Radiant financing through YCW.

102.    The original term of the loan offered by Baron was an advance of $80,000 with a repayment amount of $116,720 through 120 fixed daily payments of $972.

103.    Radiant executed the agreement on July 11, 2018.  *See* Ex. 2.

104.    On the day that YCW was supposed to fund the loan, however, Radiant was informed by Baron that the loan term would have to be shortened because YCW had learned that Radiant had an existing MCA agreement with Queen.

105.    As a result, Baron told Radiant that because YCW was in second position, the loan term had to be shorter than the first position loan with Queen.

106.    On July 20, 2018, Baron then sent Radiant a new Addendum reducing the term of the loan from 120 fixed daily payments of $972 to 80 fixed the daily payments of $1,499.

107.    In his first email, Baron stated that the term of the loan was shortened due to a prior judgment that was filed against Radiant.  Ex. 3:

Gianna,

As discussed due to the judgement we need to have a revised daily, please sign and fill below addendum and we will have you funded right away. On the renewal we can do a much longer term after you establish good pay history on this deal.

108.    That was not what he had previously said so Wolfe requested clarification.  Ex. 4:

Hi Jay,

Just to clarify, I thought the reason the underwriter cannot do 120 day term on the loan is due to having a first position already with a shorter loan term of 105 days. That's why you told me on the phone. I'm confused now. There is no judgement so I can send proof of that. Just want to know so I understand correctly, why did they need to change the terms from 120 days to 80 days again?

109.    In response, Baron confirmed that the reason for shortening the term of the loan was, in fact, due to Queen's first position.  Ex. 5:

From: **Jay Baron** <jaybrcap@gmail.com>
Date: Fri, Jul 20, 2018 at 10:06 AM
Subject: Re: Daily Addendum
To: Gianna Wolfe <gianna@radiantimages.com>

Yes that is the reason, my mistake.

110.    Thus, the loan amount negotiated by the parties was $80,000 and the principal and interest was $116,720.

111.    As a condition of the loan, YCW also charged Radiant $3,200 in fees for "Good Purchased/Services Rendered."  Thus, the principal amount received was actually $76,800 and the interest charged was $19,920.

112.    On its face, Radiant was to repay the loan by fixed daily payments of $1,499, which equates to a payment period of 80 days.  This fixed daily payment is disguised as a

18

purported good-faith estimate of what would equate to 25% of Radiant's daily receivables.  The Enterprise unilaterally included this term to disguise the true nature of the transaction.

113.    Likewise, $1,499 does not remotely represent a good-faith estimate of 25% of Radiant's daily receivables.  Instead, it is a unilateral term inserted by the Enterprise to disguise the true nature of the transaction.

114.    On the face of the agreement, YCW intended to charge and receive a simple interest rate of at least 99%.

115.    As a condition of the loan, Radiant and Wolfe were required to execute an affidavit confessing judgment.

116.    In violation of N.Y. CPLR § 3218, the affidavit does not identify a single county in which judgment may be entered by confession.  Instead, it identifies eleven different counties or courts in New York in which judgment may be entered.  Ex. 6.

117.    The Enterprise's loans were funded, and collected, through the use of interstate wires.  Each instance of funding or collection was designed to give Radiant the false impression that each agreement was a legal and enforceable transaction when it was not.

### FACTS SPECIFIC TO PLAINTIFF Y-CAPP

118.    Y-CAPP (also known as "Youth Challenged Advised & Positively Promoted") is devoted to supporting and educating families dealing with various behavioral health issues in the Richmond, Tidewater, and Charlottesville, North Carolina area

119.    Y-CAPP empowers individuals to reach their goals despite behavioral issues through the various programs including therapeutic day treatments, in-home counseling, mental health skills, summer camps, applied behavioral analysis programs, and parenting groups.

120.    The organization is owned and operated by Coleman and Pierce-Baylor.

19

**B.**     **The Enterprise Loans.**

121.   In 2012, Y-CAPP sought to hire new staff to aid in expanding its reach in the community.  To accomplish this goal, they began looking for additional sources of capital.

122.   Y-CAPP secured this capital in June 2012, under a purported merchant agreement provided by the Enterprise through Yellowstone.

123.   This transaction was not a true factoring agreement but a disguised, usurious loan.

124.   Y-CAPP has since been trapped in a never ending cycle of debt.

125.   Over a six-year period, the Enterprise constantly monitored Y-CAPP's bank accounts and solicited additional loans for Yellowstone and other companies within the Enterprise, such as Arch, Fast Business Funding, and HSC.

126.   The proceeds from one Enterprise loan would routinely be used to pay the remaining balance on another Enterprise's loan.

127.   The Enterprise's loans were funded, and collected, through the use of interstate wires.  Each instance of funding or collection was designed to give Y-CAPP the false impression that each agreement was a legal and enforceable transaction when it was not.

128.   Each text message by Davis, on behalf of the Enterprise, regarding the collection of these loans, also gave the false impression that each agreement was enforceable.

129.   As set forth in the following table, the Enterprise entered into nineteen loans with Y-CAPP, charging $843,766 in total interest (not including fees):

| Date | Organization | Loan Amount | Payback Amount | Interest | Interest Rate |
|---|---|---|---|---|---|
| 6/27/2012 | Yellowstone | $50,000 | $69,950 | $19,950 | 42% |
| 7/2/2012 | Yellowstone | $50,000 | $64,000 | $14,000 | 170% |
| 9/7/2012 | Yellowstone | $125,000 | $160,000 | $35,000 | 170% |
| 9/10/2013 | Yellowstone | $200,000 | $258,950 | $58,950 | 163% |
| 12/16/2013 | Yellowstone | $225,000 | $292,275 | $67,275 | 71% |
| 6/30/2014 | Yellowstone | $21,500 | $29,976 | $8,476 | 553% |
| 7/25/2014 | Yellowstone | $90,000 | $119,990 | $29,990 | 276% |

| | | | | | |
|---|---|---|---|---|---|
| 9/9/2014 | Yellowstone | $200,000 | $271,800 | $71,800 | 196% |
| 12/16/2014 | Yellowstone | $200,000 | $271,800 | $71,800 | 106% |
| 9/17/2015 | Yellowstone | $130,000 | $176,990 | $46,990 | 155% |
| 12/18/2015 | Arch Capital | $25,000 | $30,000 | $5,000 | 243% |
| 4/20/2016 | Arch Capital | $30,000 | $35,000 | $5,000 | 203% |
| 6/28/2015 | Yellowstone | $100,000 | $114,995 | $14,995 | 260% |
| 7/27/2016 | Yellowstone | $330,000 | $445,500 | $115,000 | 44% |
| 5/3/2017 | HSC | $20,000 | $26,000 | $6,000 | 313% |
| 7/20/2017 | HSC | $200,000 | $271,900 | $71,900 | 279% |
| 9/6/2017 | Yellowstone | $400,000 | $559,600 | $159,600 | 58% |
| **Total** | | **$2,396,500** | **$3,188,726** | **$812,226** | **Avg. 94%** |

130.    Although the interest rate was disguised on the face of these agreements, the actual facts demonstrate that the Enterprise intended to charge, and did in fact, receive a usurious rate of interest far in excess of 25%.

131.    **Loan #1 (Yellowstone):**   The first usurious loan that Y-CAPP entered into was with Yellowstone on June 27, 2012.  Ex. 7.

132.    The loan amount was $50,000 and the principal and interest was $69,950.

133.    On its face, Y-CAPP was to repay the loan by fixed daily payments of $279, which equates to a payment period of 350 days.  This fixed daily payment is disguised as a purported good-faith estimate of what would equate to 8% of Y-CAPP's daily receivables.  The Enterprise unilaterally included this term to disguise the true nature of the transaction.

134.    Likewise, $279 does not remotely represent a good-faith estimate of 8% of Y-CAPP's daily receivables.  Instead, it is a unilateral term inserted by the Enterprise to disguise the true nature of the transaction.

135.    On the face of the agreement, Yellowstone intended to charge and did receive a simple interest rate of at least 42%.

136.    **Loan #2 (Yellowstone):**   Just a few days later, Davis induced Y-CAPP to enter into a second usurious loan with Yellowstone on July 2, 2012.  Ex. 8.

137.    The loan amount was $50,000 and the principal and interest was $64,000.

138.    On its face, Y-CAPP was to repay the loan by fixed daily payments of $279, which equates to payment period of 320 days.  This fixed daily payment is disguised as a purported good-faith estimate of what would equate to 8% of Y-CAPP's daily receivables.

139.    Likewise, $279 does not remotely represent a good-faith estimate of 7% of Y-CAPP's daily receivables.  Again, this is a unilateral term inserted by the Enterprise to disguise the true nature of the transaction.

140.    While on the face of the agreement, the Enterprise charged a simple interest rate of at least 29%, the actual interest rate actually negotiated and agreed upon by the parties was much greater.  The actual term negotiated by the parties was 60 days.

141.    Despite the stated daily payment amount of $279, the Enterprise did in fact collect the full repayment amount within 60 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 170%.

142.    **Loan #3 (Yellowstone):**   Davis induced Y-CAPP to enter into a third usurious loan with Yellowstone on September 7, 2012.  Ex. 9.

143.    The loan amount was $125,000 and principal and interest was $160,000.

144.    While on its face, Y-CAPP was to repay the loan based on 12% of its daily receivables, the parties had actually negotiated and agreed upon a repayment term of 60 days.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

145.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within 60 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 170%.

146.     **Loan #4 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on September 10, 2013.  Ex. 10.

147.     The loan amount was $200,000, and the principal and interest was $258,950.

148.     While on its face, Y-CAPP was to repay the loan based on 10% of its daily receivables, the parties had actually negotiated and agreed upon a payment term of 66 days. Again, Yellowstone unilaterally included this term to disguise the true nature of the transaction.

149.     Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within 66 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 163%.

150.     **Loan #5 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on December 16, 2013.  Ex. 11.

151.     The loan amount was $225,000 and principal and interest was $292,275.

152.     While on its face, Y-CAPP was to repay the loan based on 11% of its daily receivables, the parties had actually negotiated and agreed upon a repayment term of six months. Again, Yellowstone unilaterally included this term to disguise the true nature of the transaction.

153.     Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within six months as negotiated and agreed upon, which resulted in a simple interest rate of 71%.

154.     **Loan #6 (Yellowstone):**   Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on June 30, 2014.  Ex. 12.

155.     The loan amount was $21,500 and principal and interest was $29,976.

156.     While on its face, Y-CAPP was to repay the loan based on 5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 26

days.   Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

157.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within 26 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 553%.

158.    **Loan #7 (Yellowstone):**   Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on July 25, 2014.  Ex. 13.

159.    The loan amount was $90,000 and principal and interest was $119,990.

160.    While on its face, Y-CAPP was to repay the loan based on 7.5% of its daily receivables, the parties had actually negotiated and agreed upon fixed repayment term of three months, which would have resulted in an interest rate in excess of 117%.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

161.    Despite the stated daily percentage amount, the Enterprise nonetheless collected the full repayment amount in exactly 44 days by requiring Y-CAPP to pay off the loan early through a new usurious loan with the Enterprise, which resulted in an unconscionable simple interest rate of 276%.

162.    **Loan #8 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on September 9, 2014.  Ex. 14.

163.    The loan amount was $200,000 and principal and interest was $271,800.

164.    While on its face, Y-CAPP was to repay the loan based on 9.5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three months, which would have resulted in an interest rate of 146%.   Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

165.    Despite the stated daily percentage amount, the Enterprise nonetheless collected the full repayment amount in exactly 67 days by requiring Y-CAPP to pay off the loan early through a new usurious loan with the Enterprise, which resulted in an unconscionable simple interest rate of 196%.

166.    **Loan #9 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on December 16, 2014.  Ex. 15.

167.    The loan amount was $200,000 and the principal and interest was $271,800.

168.    While on its face, Y-CAPP was to repay the loan based on 9.5% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of four months.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

169.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within four months as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 106%.

170.    **Loan #10 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on September 17, 2015.   Ex. 16.

171.    The loan amount was $130,000 and the principal and interest was $176,990.

172.    While on its face, Y-CAPP was to repay the loan based on 6% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three months.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

173.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within six months as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 155%.

174.    **Loan #11 (Arch)**:  Davis induced Y-CAPP to enter into another usurious loan with its affiliate Arch on December 18, 2015.   Ex. 17.

175.    The loan amount was $25,000 and the principal and interest was $30,000.

176.    While on its face, Y-CAPP was to repay the loan based on 10% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 40 days.  Again, Arch unilaterally included this term to disguise the true nature of the transaction.

177.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within 40 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 243%.

178.    **Loan #12 (Arch)**:  Davis induced Y-CAPP to enter into another usurious loan with Arch on April 20, 2016.   Ex. 18.

179.    The loan amount was $30,000 and the principal and interest was $35,000.

180.    While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of 40 days.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

181.    Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within 40 days as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 203%.

182.   **Loan #13 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on June 28, 2016.  Ex. 19.

183.   The loan amount was $100,000 and the principal and interest was $114,995.

184.   While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of three weeks.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

185.   Despite the stated daily percentage amount, the Enterprise did in fact collect the full repayment amount within three weeks as negotiated and agreed upon, which resulted in an unconscionable simple interest rate of 260%

186.   **Loan #14 (Yellowstone):**  Davis induced Y-CAPP to enter into another usurious loan with Yellowstone on July 27, 2016.  Ex. 20.

187.   The loan amount was $330,000 and the principal and interest was $445,500.

188.   While on its face, Y-CAPP was to repay the loan based on 9% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of eight months.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

189.   This agreement also contains an Addendum, which purports to adjust the daily payment to just $1,000 per day.  Yet again, this Addendum was unilaterally included by Yellowstone to disguise the usurious nature of the transaction.

190.   Despite the stated daily percentage and daily payment amount listed on the Addendum, the parties had expressly negotiated an eight-month term.  Specifically, the parties agreed that Y-CAPP would make weekly payments of at least $20,000 per week, but only

$10,000 per week when payroll was due.  This agreement is confirmed by numerous texts between Y-CAPP and Davis.

191.    In fact, on numerous occasions, Davis demanded that the fixed $10,000 weekly payment be paid, and if a payment was missed, Davis demanded that the payment be made up by debiting twice the agreed amount the following week.

192.    Davis also charged $10,000 for bouncing the weekly payments when Y-CAPP could not make the suffocating weekly payments.

193.    As agreed and intended by the parties, the Enterprise did in fact collect the full repayment amount in approximately eight months (292 days) as negotiated and agreed upon, which resulted in a simple interest rate in excess of 44%.

194.    **Loan #15 (HSC):**  Davis induced Y-CAPP to enter into another usurious loan with HSC on May 3, 2017.   Ex. 21.

195.    The loan amount was $20,000 and principal and interest was $26,000.

196.    While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had expressly negotiated and agreed upon a fixed repayment term of 30 days.  Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

197.    These confirmed terms are reflected in texts between Y-CAPP and Davis.

198.    As expressly negotiated by the parties in advance, Y-CAPP was to repay the loan through 26 fixed daily payments of $999.  This negotiated amount is actually reflected in an Addendum to the loan, which fixes the daily payments at $999 per day.

199.    Moreover, Davis warned Y-CAPP that it would not be allowed to miss a payment, and if it did, Y-CAPP would be charged $2,500 if there were more than two "bounces."

200.   Thus, just like all of the other agreements, in order to avoid the usury laws of this state, the Enterprise disguised this fixed daily payment by falsely representing on the face of the agreement that the $999 per day is a good-faith estimate of 15% of Y-CAPP's daily receivables.

201.   As negotiated by the parties, and as reflected in Davis' own text, the Enterprise collected the full repayment amount in exactly "26 business days" and "35 calendar days," which resulted in an unconscionable simple interest rate of 313%.

202.   **Loan #16 (HSC):**   Davis induced Y-CAPP to enter into another usurious loan with HSC on July 20, 2017.   Ex. 22.

203.   The loan amount was $200,000 and the principal and interest was $271,900.

204.   While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of six months.   Again, the Enterprise unilaterally included this term to disguise the true nature of the transaction.

205.   These confirmed terms are reflected in texts between Y-CAPP and Davis.

206.   As expressly negotiated by the parties in advance, Y-CAPP was to repay the loan through 27 fixed weekly payments of $9,995.   This negotiated amount is actually reflected in an Addendum to the loan, which fixes the weekly payments at $9,995 per day.

207.   Thus, just like all of the other agreements, in order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $9,995 per week is a good-faith estimate of 15% of Y-CAPP's weekly receivables.

208.   As negotiated by the parties, and as reflected in Davis' own text, the Enterprise intended to charge and collect the full repayment amount in exactly 27 weeks, which would have resulted in a simple interest rate in excess of 70%.

209.    The actual interest rate charged and received by the Enterprise, however, was even worse because Davis required Y-CAPP to pay off the loan early just 47 days later for the privilege of taking out yet another usurious loan with the Enterprise.

210.    The unconscionable interest rate on this loan was in excess of 279%.

211.    **Loan #17 (Yellowstone):**  Davis induced Y-CAPP to enter into the last and final usurious loan with Yellowstone on September 6, 2017.   Ex. 23.

212.    The loan amount was $400,000 and the principal and interest was $559,600.

213.    Yellowstone also charged Y-CAPP an outrageous $20,000 origination fee.

214.    While on its face, Y-CAPP was to repay the loan based on 15% of its daily receivables, the parties had actually negotiated and agreed upon a fixed repayment term of ten months.  Again, the Enterprise unilaterally included this term to disguise its true nature.

215.    As negotiated by the parties in advance, Y-CAPP was to repay the loan through "weekly payments of 12,500 until October 10 and then 12,500 and 20k every other week."

216.    These confirmed terms are reflected in texts between Y-CAPP and Davis.

217.    Among these texts, Davis admitted that this "is a long deal (10 months)…."

218.    This negotiated amount is also reflected in an Addendum to the loan, which fixes the weekly payments at $19,995 per day.

219.    Thus, just like all of the other agreements, in order to avoid the usury laws, the Enterprise disguised this fixed daily payment by falsely representing that $19,995 per week is a good-faith estimate of 15% of Y-CAPP's weekly receivables.

220.    Notably, this purported good-faith estimate is twice the good-faith estimate of the prior July 20, 2017 agreement that, just six weeks earlier, falsely represented the same percentage of receivables was $9,995.   Y-CAPP's receivables did not double in six weeks.

30

221.    As negotiated and agreed upon by the parties, and as reflected in Davis' own texts, the Enterprise intended to charge and receive the full repayment amount over ten months, which results in a simple interest rate in excess of 50% without consideration of the $20,000 Origination Fee.   When counting this outrageous fee, the simple interest rate exceeds 58%. Either way, both are twice that permitted under New York penal law.

222.    The Enterprise's loans were funded, and collected, through the use of interstate wires.  Each instance of funding or collection was designed to give Radiant the false impression that each agreement was a legal and enforceable transaction when it was not.

**D.    Davis' Text Messages Confirm the True Nature of the Transaction.**

223.    The MCA agreements used by the Enterprise are a mere cover for the usurious nature of the transaction.

224.    Despite its form, each transaction was an advance of money with interest that was absolutely repayable over a fixed period of time.

225.    Below are just a few examples, of the actual terms of the loans:

the 12,500 is that payment for both or will i have two payments?  we cant do that



I know you can't do that. You want a lot of money. Anyone that does a deal needs to get paid in a certain time frame

You have a 39k balance so would be an 85k deal. I'll do the cheap factor we always do which is 1.35 and over 20 weeks 5750 weekly

we won't need to do 85 we can do 75k at cheap rate of 1.33 and payback will be 99,950

Weekly payment will be 4995 a week

20k paying 26 at 999 daily payment. That's 26 business days 35 calendar days

26 payback I agreed to and you said 30 days and this is 40 days now at if we start Tuesday. 20k contracts I can't do 0 fees it's already 3k discount on t

he payback.

Total pay back amount?

139,900 it's 6 months term

200k paying 271,900 at 9,995 weekly

I can prob make something happen for 200k which would be about 185k in the bank and 12,500 weekly. But don't want to put you in a bad position making payments

I can do 400k paying off your balance of 252,000 purchasing 559,600 weekly payment of 12,500 until October 10th and then 12,500 and 20k every other week

You will net 145k in account and that's 1% origination fees which is a greatt deal. This is a long deal (10 months) and cheaper deal and it's what I can

need a short term loan. we just got this information. we need 153k in the bank. get 133k bank in two weeks and the remaining 10 plus what you charge for a short term loan back over the

il then and 133k wire or debit on sep 5th and remainder split over the next 2 weeks. So if paid by by the 19th of September will be a 31.600 discount to

t for it to make sense. I can do 158k (netting 152,500) purchasing 224,995. will offer a 20% discount if paid by sep 19th. No daily or weekly payment unt

I can't do that bc at the end of the day I work for a company and can't do 10k for a month on 160k it doesn't work. My cost of capital is more than that

As per our agreement we are scheduled to debit 19,995 for tomorrow plus I need 7500 as a wire as discussed. If you want you can

What other lender? You can't afford our patents and now you thjnk you can pay a new lender also??

226. The text messages from Davis further confirm that the loan amount was absolutely repayable and that if payments were not made as demanded, Y-CAPP would be in breach and face legal action, which is exactly what happened:

Mannnn Donna is not feeling good about any deal because of what John did to us and you taken that extra $10,000 today. She said she didn't think you would do stuff like that. I will check back with her next week and get with you. Thanks for having my back bro.

We did make up for last week which bounced

Need answers asap or legal is filing the judgement

It's a problem

I understand but we need payments going forward and to be debited. Call me today to discuss. Thanks

That's not going to work. We gave you an extremely long and good deal of payments were normal and now we are very behind and 7500 and 5 is not doable. 1

0 and 7500 is bare bones minimum that we need. And if there are more bounce payments it's out of my control and legal will file and we both don't want th

I will set up 9,999 for tomorrow and 7500 for the week after that 50% reduction. Make sure there are no bounces or issues on this or it will be out of my


10/30/17 12:06 PM

Let me know bc we can not have another bounce. Thanks

> Jon I did everything you asked for and we are on very reduced weekly payments. We need 7500 minimum a week as agreed

> Sure the 7500 clears or legal will file the affidavit of confession of judgment and we both DO NOT WANT THAT. please advise asap

> Jon I can't do that. 7500 is the bare bones minimum we need. I can't have a week with nothing paid or legal will take over and will be outa my hands

> I can't wait for a lender to come through. Need the weekly payment for this coming Tuesday back on and won't do a makeup for now. If it bounces again I w

> ill not be able to stop legal from filing

> We need payments to clear tomorrow to avoid legal action. Please confirm they will clear for the 7500

> I need that to hold off my legal department. Make it happen thanks

227.   The text messages from Y-CAPP also demonstrate that it understood that the loans were absolutely repayable even if Y-CAPP had to borrow money to repay:

> man the other 7500 didnt come. doing all i can just to stay open. have to pay you, irs, insurance.  the 7500 a week is killing us. cant get any additional business like we thought

I have two other lenders who im trying to get the money from. i didnt know we would only get 88k today with 65k to taxes and 50k for a must pay for health insurance. they will let me know something within 24 hours. im pushing as hard as i can

I know you need a weekly payment but they didn't give to me today. i working to get it from the other linder. they are working on it now and will have a answer within 24 hours

i have no other alternative. to make rhis payment this week

im working on it ad hard as hard as i can. got denied by one Lender looking for the other one to give me an answer tomorrow. i promise you im trying to get your weekly payment.  i know whats on the line

i know you jave worked with me. we are rite there. we have added about 50 new students over the last few months but with the days out of school and the holidays it has made us short. i didnt know we would only get 88k this week. im trying to get your money and pay taxes and make payroll. i have to do all 3 to make sure the money still comes in. if i dont pay the taxes we are done, if i dont pay you we are done and if i dont pay payroll and insurance i dont have any one to work. im trying to get it

### E.    Yellowstone's Fraudulent Judgment

228.    As further security to ensure that its loans were absolutely repayable, the Enterprise required Plaintiffs to sign an affidavit confessing judgment.

36

229.    In November 2017, various factors delayed Y-CAPP's receipt of additional income.  Additionally, the company was forced to incur several large expenditures.

230.    In light of these circumstances, on November 27, 2017, Y-CAPP requested that Yellowstone briefly suspend the required weekly payments for three weeks, explaining:

> The New Y-CAPP Inc. would like to make an official request for a temporary suspension of our weekly deductions for the next three weeks.  This week our agency will only receive approximately $83,000 and YCAPP has an obligation with a tax balance of $62,000 and a $50,000 insurance payment.  With these payments, it has left YCAPP unable to sustain any additional deductions.  YCAPP is aware that any bounced payments could lead to legal actions from your company and for this reasons we are requesting a brief suspension of payments.  While we have received the MIS numbers needed to generate the additional funds, it will take at a minimum 3 weeks for The New Y-CAPP Inc. to begin to receive payments making it impossible for us to meet our obligations to Yellowstone Capital at this time.

231.    Yellowstone ignored this request.

232.    Coleman followed up in a text message on November 29, 2017, explaining that Y-CAPP had experienced an unexpected decrease in receivables.

> i know that you jave worked with me. we are rite there. we have added about 50 new students over the last few months but with the days out of school and holidays it has made us short. i didn't know we would only get 88k this week. im truing to get your mney and pay taxes and make payroll. i have to do all 3 to make sure the money still comes in. if i don't pay the taxes we are done, if i don't pay you we are done and if i don't pay payroll and insurance i don't have any one to work. im trying to get it.

233.    Coleman explained: "i have never made this little in 3 months. just look at the deposits."

234.    On December 1, 2017, Y-CAPP again requested a three-week suspension of payments, but Davis denied the request, stating: "We cannot do this I'm sorry. We missed last week and need 7500 this week or will take legal action. Guide yourself accordingly."

235.    Less than a week later, on December 4, 2017, Davis again demanded a $7,500 payment from Y-CAPP.

236.    Y-CAPP again explained to Davis that it did not have sufficient funds through the following text exchange with Davis:

> Davis:   We need payments to clear tomorrow to avoid legal action.   Please confirm they will clear for the 7500.
>
> Y-CAPP:  as of now we will not have the money.  Im still trying.  it will be next week before the money from the MIS numbers start to come in.  I know you will turn the case to legal.
>
> Davis:  How much you getting tomorrow?
>
> Y-CAPP:   184k…after payroll on Tuesday of 180k its only 4k remaining.  i moved payroll from Friday to Tuesday just so i can pay my people so they continue to work.  im trying to get you the other $3,500 to pay you, but I have [borrowed] from everyone.

237.    On December 5, 2017, Coleman was able to locate enough funds to make a $5,000 payment and asked for additional time to recover the remainder:

> Gm..i couldn't get any more from anyone but they paid us a little more and i transferred all we had to make payroll and leave $5k in the account. That is everything. you can see its getting better i just need more time and with the holidays coming its just gonna take a few more week but progress is happening. if its anything you can do to show them we are trying and its getting better. show tbem if they can hold off for a few more weeks before taken legal actions and take the 5k then they will get their money.

238.    Despite Coleman's pleas, Davis directed Yellowstone to remove $7,500 from Y-CAPP's account, prompting Coleman to tell Davis: "hey i see they took the 7500k. man dont let them shut us down over 2500. we are so close. i just need a few more weeks."

239.    Davis disregarded this plea, stating that the full $7500 was required or else.

240.    At 5:37 P.M. on December 5, 2017, Y-CAPP texted Davis informing him that it had just received another $720 check and that he would transfer the money in the morning.

241. At 6:55 A.M. on December 6, 2017, Y-CAPP informed Davis that it had the payment's remaining balance.

242. Upon receiving this information, Davis promptly sent Y-CAPP Yellowstone's wire transfer information.

243. Incredibly, however, because Y-CAPP did not have sufficient funds to pay the $7,500 in full by December 5, 2017, Davis instructed MCA Recovery to obtain a judgment by confession against Y-CAPP, Coleman, and Pierce-Baylor totaling $613,746.13. In doing so, Yellowstone through MCA Recovery submitted a false affidavit swearing under oath that Y-CAPP was in breach because it had blocked Yellowstone from debiting its account. Davis knew that representation was false and that the real reason was lack of receipts.

## CLASS ALLEGATIONS

244. Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

245. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

246. Plaintiffs Y-CAPP and Radiant bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> **RICO Merchant Class:** All persons in the United States who, on or after August 8, 2014 paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

> **Confession Merchant Class:** All persons in the United States who, on or after August 8, 2014, executed an affidavit confessing judgment in violation of N.Y. C.P.L.R. § 3218 pursuant to an MCA Agreement with a member of the Enterprise.

247. Y-CAPP brings this action on behalf of itself and a class of similarly situated persons defined as follows:

**Judgment Merchant Class:**  All persons in the United States who, on or after August 8, 2014, had a New York judgment by confession entered against it by a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

**Restraining Notice Merchant Class:**  All persons in the United States who, on or after August 8, 2014, had a Retraining Notice issued to a third-party based on a judgment obtained by a member of the Enterprise pursuant to an MCA Agreement.

**Levy and Demand Merchant Class:**  All persons in the United States who, on or after August 8, 2014, had a Levy and Demand issued by a New York City Marshal to an out-of-state third-party based on a judgment obtained by a member of the Enterprise pursuant to an MCA Agreement.

248.    Plaintiffs Wolfe, Pierce-Baylor, and Coleman bring this action individually and

on behalf of classes of similarly situated persons defined as follows:

**RICO Principal Class:**  All persons in the United States who, on or after August 8, 2014, individually as a principal, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

**Confession Principal Class:**  All persons in the United States who, on or after August 8, 2014, individually as a principal, executed an affidavit confessing judgment in violation of N.Y. C.P.L.R. § 3218 pursuant to an MCA Agreement with a member of the Enterprise.

249.    Donna Piece-Baylor and Jonathan Coleman bring this action on behalf of themselves and a class of similarly situated persons defined as follows:

**Judgment Principal Class:**  All persons in the United States who, on or after August 8, 2014, individually as a principal, had a New York judgment by confession entered against it by a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

**Restraining Notice Principal Class:**  All persons in the United States who, on or after August 8, 2014, individually as a principal, had a Retraining Notice issued to an out-of-state third-party based on a judgment obtained by a member of the Enterprise pursuant to an MCA Agreement.

**Levy and Demand Principal Class:**  All persons in the United States who, on or after August 8, 2014, individually as a principal, had a Levy

40

and Demand issued by a New York City Marshal to an out-of-state third-party based on a judgment obtained by a member of the Enterprise pursuant to an MCA Agreement.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

250.   **Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the thousands.

251.   **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

a)  Whether the MCA Agreements are loans;

b)  Whether the MCA Agreements are usurious;

c)  Whether the MCA Agreements are void;

d)  Whether Plaintiffs and the Classes may recover any moneys or property paid to the Enterprise pursuant to the MCA agreements;

e)  Whether the affidavits confessing judgment violate N.Y. C.P.L.R. § 3218;

41

f) Whether the restraining notices issued on out-of-state third parties was unlawful;

g) Whether the levies and demands served by a New York City Marshal on out-of-state third parties was unlawful; and

h) Whether Defendants' conduct was willful or knowing.

252. **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

253. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

254. **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues

presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

### By Plaintiffs and the Classes against
### All Defendants

255.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

256.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

257.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

258.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

259.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

260.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

261.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

262.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

263.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

264.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

265.    Stern, Davis, MCA Recovery, Arch, HSC, YCW, and Yellowstone are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

266.    At all relevant times, each of Stern, Davis, MCA Recovery, Arch, HSC and Yellowstone was, and is, a person that exists separate and distinct from the Enterprise, described below.

267.    Yellowstone is a limited liability company organized and existing under the laws of the State of New York.

268.    Upon information and belief, Stern has a controlling ownership interest in HSC, YCW, and Yellowstone, and is the Chief Executive Officer of HSC, YCW and Yellowstone.

269.     Upon information and belief, Davis is an officer of HSC, Yellowstone and YCW and holds the title of Chief Underwriting Officer.

270.     MCA Recovery provides legal services to the Enterprise and collects upon the debts of the Enterprise.  Yellowstone has a partial ownership interest in MCA Recovery.  On information and belief, Arch also has a partial ownership interest in MCA Recovery.

271.     Arch solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

272.     HSC solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

273.     Yellowstone solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

274.     YCW solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.     The Enterprise.**

275.     Stern, Davis, Yellowstone, YCW, Arch, HSC, MCA Recovery, and the John and Jane Doe Investors, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

276.     Stern, Davis, Yellowstone, YCW, Arch, HSC, MCA Recovery, and the John and Jane Doe Investors (the "Investors") are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

277.     Since at least 2012 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including Y-CAPP, Radiant and the Class Members.

278.     The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

**D.     Each Member's Role in the Enterprise.**

279.     The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.     Defendant Stern**

280.     Upon information and belief, Stern is an owner and the Chief Executive Officer of HSC, Yellowstone and YCW.  Together with Davis, Stern is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to Y-CAPP, Radiant and the Class Members.

281.    In his capacity as the day-to-day leader of the Enterprise, Stern, together with Davis, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.   All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Y-CAPP, Radiant and the Class Members.

282.    Stern has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

283.    Stern has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, YCW, Arch, HSC, MCA Recovery and to the Investors of the deals in which he, upon information and belief, has personally participated.

  **ii.    Defendant Davis**

284.    Upon information and belief, Davis is the Chief Underwriting Officer of HSC, Yellowstone, and YCW.  Upon information and belief, together with Stern, Davis is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such

loans will be funded, which of the Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.   Davis participated in, oversaw and ultimately approved each of the loans extended to Y-CAPP, Radiant and the Class Members.

285.    Upon and information and belief, in his capacity as the day-to-day leader of the Enterprise, Davis, together with Stern, is responsible for creating, approving and implementing the instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.   All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Y-CAPP, Radiant and the Class Members.

286.    Davis has also taken actions and, directed other members of the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise including personally funding certain of the usurious loans and sending emails and making telephone calls to collect upon the usurious loans and executing affidavits and other legal documents in support of the Enterprise's efforts to fraudulently induce the Courts of New York and other states to enforce and collect upon the usurious loans.   On information and belief, Davis directed that MCA Recovery, take action to obtain and collect upon a judgment against Y-CAPP and other Class Members.   In order to obtain such judgment and in furtherance of the goals and purposes of the Enterprise, Davis executed an affidavit that intentionally misrepresented the nature of the

transactions between the Enterprise and Y-CAPP in order to induce the entry of a judgment by the Clerk of the Supreme Court of New York, County of Erie.

287.    Davis has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to HSC, YCW and Yellowstone and to the Investors of the deals in which he, upon information and belief, has personally participated.

### iii.    Defendant Yellowstone

288.    Yellowstone is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Arch, HSC, YCW and MCA Recovery.

289.    Directly and through Stern, Davis and its other agent employees, Yellowstone has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  Yellowstone has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

290.    In this case, Yellowstone: (i) solicited borrowers, including Y-CAPP and other Class Members; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Y-CAPP' and

the Class Members; and (vi) upon the alleged default by Y-CAPP and other Class Members, directed MCA Recovery to obtain a Judgment in Yellowstone's name and collect upon the unlawful debt evidenced therein.

291.   Upon information and belief, Yellowstone ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, Yellowstone has directly participated.

**iv.      Defendant YCW**

292.   YCW is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Arch, HSC, Yellowstone and MCA Recovery.

293.   Directly and through Stern, Davis and its other agent employees, YCW has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  YCW has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

294.   In this case, YCW: (i) entered into a contract with Blue Rock Capital Solutions to solicit borrowers, including Radiant and other Class Members; (ii) pooled funds from Investors

to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Radiant and the Class Members; and (vi) upon the alleged default by Radiant and other Class Members, directed that MCA Recovery to obtain the Judgment in Yellowstone's name and collect upon the unlawful debt evidenced therein.

295.    Upon information and belief, YCW ultimately benefits from the Enterprises unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, YCW has directly participated.

### v.    Defendant HSC

296.    HSC is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Arch, YCW Yellowstone and MCA Recovery.

297.    Directly and through Stern, Davis and its other agent employees, HSC has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  HSC has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

298.   In this case, HSC: (i) solicited borrowers, including Y-CAPP and other Class Members; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Y-CAPP' and the Class Members.

299.   Upon information and belief, HSC ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, HSC has directly participated.

**vi.     Defendant Arch**

300.   Arch is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of HSC, YCW, Yellowstone and MCA Recovery.

301.   Directly and through Stern, Davis and its other agent employees, Arch has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  Arch has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt.

52

302.     In this case, Arch: (i) pooled funds from Investors to fund the Agreements; (ii) underwrote the Agreements; (iii) entered into the Agreements; and (iv) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Y-CAPP' and the Class Members.

303.     Upon information and belief, Arch ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, Arch has directly participated.

**vii.     The Investors**

304.     The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Arch, HSC, YCW, Yellowstone and MCA Recovery.

305.     Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Arch, HSC, YCW, and Yellowstone with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

306.     The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### viii.    MCA Recovery

307.    MCA Recovery is a debt collection company.  It is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Arch, HSC, YCW, and Yellowstone.

308.    Upon default of a borrower's obligations under the usurious loan agreements and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, at the Defendants' direction, MCA Recovery prepares affidavits for execution by Davis and/or other employees of Arch, HSC, YCW and Yellowstone that falsely represent the transactions constitute the sale and purchase of future receivables in order to conceal the usurious and unlawful nature of the transactions and induce Courts of New York and elsewhere to enter judgments in favor of Arch, HSC, YCW and Yellowstone, including the Judgment entered against Y-CAPP.

309.    Together with these affidavits and in furtherance of the Enterprise's goal of collecting upon the unlawful debt, MCA Recovery has filed hundreds, if not thousands, of Affidavits of Confessions with the Clerks of the Courts of New York.  In reliance upon the false affidavits of Davis and other employees of Arch, HSC, YCW and Yellowstone, the Clerks of the Courts of New York enter judgments in favor of Yellowstone that, based upon the representations made by Arch, HSC, YCW and Yellowstone in the supporting affidavits, include not only the outstanding sums of principal and usurious interest allegedly due and owing under the loans, but also fees for attorneys' services that have not, and may never be, rendered.

310.    In this case, on December 5, 2017, upon Y-CAPP's alleged default under the September 6, 2017 agreement with Yellowstone (the "September 2017 Agreement"), at Davis' direction, MCA Recovery prepared an affidavit that intentionally misrepresented the nature of the transaction as the sale of receivables in order to induce the Clerk of Supreme Court of New

York, County of Erie, to enter a judgment against Plaintiffs on account of the unlawful debt, which he did. The affidavit also intentionally misrepresented that Y-CAPP had breached the September 2017 Agreement by blocking access to the account and that Pierce-Baylor and Coleman were personally liable under the September 2017 Agreement because Y-CAPP had breached the September 2017 Agreement.

311.    On April 13, 2018, in a further effort to collect upon the unlawful debt and accomplish the goals and purpose of the Enterprise, MCA Recovery directed a New York City Marshal, Vadim Barbarovich, to unlawfully serve a Levy and Demand on Bank of America despite knowing that any funds held by Coleman or Pierce-Baylor were held at their local branch in Virginia.

312.    On April 24, 2018, MCA Recovery, acting under the color of New York law and at the Davis' direction, issued subpoenas with temporary restraining notice to Y-CAPP's third-party claims processor, Magellan Healthcare, Inc., in an effort to collect upon the unlawful debt.

313.    MCA Recovery ultimately benefits from the Enterprise's unlawful activity by receiving a portion of the unlawful debt collection as a fee.

### E.    Interstate Commerce

314.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

315.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Virginia and California, including the Radiant, Y-CAPP and the Class Members, and throughout the United States via extensive use of

interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

316.    In the present case, all communications between the members of the Enterprise, Radiant, Y-CAPP and the Class Members were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

317.    In addition, at the direction of Arch, HSC, YCW, and Yellowstone, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements and the applicable Confession Affidavits were sent from California or Virginia to Arch, HSC, YCW, and Yellowstone at their offices in New Jersey via Federal Express using labels prepared by Arch, HSC, YCW, and Yellowstone.

**F.      Injury and Causation.**

318.    Plaintiffs and the Class Members have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

319.    The injuries to the Plaintiffs and the putative Class Members directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

320.    Plaintiffs and the Class Members have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

321.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Defendants.

<div align="center">

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

**By Plaintiffs and the Classes against**
**All Defendants**

</div>

322.    The Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

323.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

324.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

325.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

326.    Plaintiffs and the Class Members have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

327.    The injuries to the Plaintiffs and the Class Members directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments and the unlawful entry and enforcement of judgments.

328.    Plaintiffs and the Class Members have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

329.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.  The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt, including the Agreements.

## THIRD CAUSE OF ACTION
### (Fraud)

### By Y-CAPP, Pierce-Baylor, Coleman, Judgment Merchant and Judgment Principal Classes against Yellowstone and MCA Recovery

330.    Plaintiffs and the Judgment Principal Class Members repeat and re-allege the allegations set forth above herein.

### A.    Fraud Concerning the Judgment

331.    On December 5, 2017, at the direction of Davis, Avrahim Weinstein executed an affidavit representing under oath that Y-CAPP had breached the terms of the MCA agreement with Yellowstone by "blocking [Yellowstone's] access to the Account and by preventing [Yellowstone] from debiting the Account per the Agreement" (the "Weinstein Affidavit").

332.    The Weinstein Affidavit also represented that the "Personal Guarantees provide that in the event of [Y-CAPP's] default under any of the terms of the Agreement, including blocking ACH debits or depositing their accounts-receivable into a bank account other than the Account, [Yellowstone] may enforce its rights against [Y-CAPP] under the Agreement against [] Jonathan, and [] Donna, without first seeking recourse from [Y-CAPP]."

333.    The first statement was knowingly false because Y-CAPP never instructed its bank to block Yellowstone's access to its account.  Nor did Y-CAPP take any action to prevent Yellowstone from debiting the Account.  Davis knew this representation was false because Y-CAPP had repeatedly informed him that Y-CAPP did not have sufficient funds in the Account to make the weekly payment that Davis demanded to be paid by December 5, 2017.

334.    In fact, Y-CAPP specifically told Davis that it not have sufficient funds by text:



We need payments to clear tomorrow to avoid legal action. Please confirm they will clear for the 7500

12/4/17 5:05 PM

as of now we will not have the money. Im still trying. it will be next week before the money from the MIS numbers start to come in. I know you will turn the case to legal

335. The second statement was knowingly false because the Personal Guarantee does not permit Yellowstone to enforce the Personal Guarantee in the event of Y-CAPP's "default under any **terms** of the Agreement."  Instead, the Personal Guarantee is limited to Y-CAPP's performance of "all of the **representations, warranties, covenants** made by Merchant in this Agreement and the Merchant Agreement."  The Weinstein Affidavit does not allege that Y-CAPP breached a single representation, warranty or covenant, and Davis knew that Y-CAPP had not breached any representation, warranty or covenant.

336. Despite knowing that these representations were false, Davis directed MCA Recovery to file and obtain a judgment by confession against Y-CAPP, Peirce-Baylor and Coleman.

337. On December 5, 2017, MCA Recovery filed the Weinstein Affidavit in support of the judgment by confession.

338. On information and belief, the Clerk of Erie County, New York relied upon the knowingly false representations contained in the Weinstein Affidavit.

339. On information and belief, but for these knowingly false representations, the Clerk of Erie County, New York would not have entered judgment.

340.    Y-CAPP, Peirce-Baylor and Coleman were directly and proximately damaged by these knowingly false representations by having a fraudulent judgment entered against them by the Clerk of Erie County, New York.

341.    Among other damages, Y-CAPP, Peirce-Baylor and Coleman incurred attorney's fees and costs to enjoin Yellowstone's judgment collection efforts, as well having to file a plenary action to vacate the judgment.

342.    The conduct by Yellowstone, MCA Recovery and Davis was intentional, outrageous and in reckless disregard of the rights of Y-CAPP, Pierce-Baylor and Coleman.

### FOURTH CAUSE OF ACTION
**(N.Y. C.P.L.R. § 3218)**

**By Plaintiffs and the Confession Merchant and Confession Principal Classes
against Arch, HSC, YCW and Yellowstone**

343.    Plaintiffs and the putative Class Members repeat and re-allege the allegations set forth above herein.

344.    Pursuant to CPLR § 3218, a judgment by confession may be entered upon an affidavit executed by the defendant "stating the sum of which judgment may be entered, authorizing the entry of judgment, and stating the county where the defendant resides *or if a non-resident, **the** county in which entry is authorized*."  CPLR § 3218 (1)(a) (emphasis added).  Upon occurrence of any conditions precedent to its entry, judgment may be entered "with the clerk of ***the* county *designed in the affidavit*.**"  CPLR § 3218(b) (emphasis added).

345.    The affidavits confessing judgment executed by Plaintiffs and the putative Class members violate the strict requirements of § 3218 because "the county" where judgment may be entered is not "ascertainable from the affidavit."

346.     Rather, the affidavits confessing judgment executed in connection with each MCA agreement identifies numerous different counties or courts where the judgment may be entered, which are scattered all over the state: as far west as Erie, as far north as Ontario, as far east as Richmond, and as far south as the Southern District of New York.

347.     In other words, the affidavits give the debtor and its creditors advanced notice that judgment may be entered in any one of New York's four corners.  That is not and cannot be what the Legislature contemplated when it purposely amended New York's confession of judgment statute to ensure the "proper county" in which judgment may be entered "will be ascertainable from the affidavit."

348.     Accordingly, the affidavits confessing judgment are defective on their face.

### FIFTH CAUSE OF ACTION
**(Wrongful Execution Regarding Levies and Demands)**

**By Y-CAPP, Pierce-Baylor, Coleman and
the Levy and Demand Merchant and Levy and Demand Principal Classes
against Yellowstone and MCA Recovery**

349.     Plaintiffs and the putative Class Members repeat and re-allege the allegations set forth above herein.

350.     Pursuant to Section 1609(1)(b) of the New York City Civil Act, the authority of a Marshal for the City of New York to execute and levy upon property in satisfaction of a judgement is limited to the geographical boundaries of the City of New York.

351.     The New York City Marshals Handbook of Regulations specifically states that a marshal's power to levy does not extend beyond the boundaries of New York City.

352.     Yellowstone, MCA Recovery and Barbarovich each knew that a marshal's authority to levy is limited to the City of New York.

353.     Notwithstanding the limits of a marshal's authority, Yellowstone, through MCA Recovery, issued executions against out-of-state entities and directed Barbarovich to make a levy and demand upon out-of-state entities in connection with Yellowstone's efforts to collect upon the judgment against Y-CAPP, Pierce-Baylor, Coleman and the putative Class Members.

354.     At the direction of Yellowstone and MCA Recovery, Barbarovich did, in fact, issue the out-of-state levies to collect upon the judgment against Y-CAPP, Pierce-Baylor, Coleman and the putative Class Members.

355.     A levy served outside a New York City Marshal's jurisdictional territory is void.

356.     The funds obtained by Yellowstone through a New York City Marshal in violation of his authority constitutes a wrongful execution.

### SIXTH CAUSE OF ACTION
**(Wrongful Execution Regarding Restraining Notices)**

**By Y-CAPP, Pierce-Baylor, Coleman and
the Restraining Notice Merchant and Restraining Notice Principal Classes
against Yellowstone and MCA Recovery**

357.     Plaintiffs and the putative Class Members repeat and re-allege the allegations set forth above herein.

358.     The general rule in New York is that the judgment creditor must serve the particular branch of the bank where the account is maintained in order to reach that specific bank account. *See Therm-X-Chemical & Oil Corp. v. Extebank*, 444 N.Y.S.2d 26, 27 (2d Dep't 1981).

359.     The "separate entity" rule provides that even when a bank is subject to personal jurisdiction in New York, each of its branches are to be treated as separate entities for purposes of both prejudgment attachments and post-judgment restraining notices.  *See Motorola v. Standard Bank*, 996 N.Y.S.2d 594, 597, 21 N.E.3d 223, 226 (2014).

360.    Therefore, a restraining notice, execution order or marshal's levy served on one New York branch will have no impact on assets held in accounts at other branches of the same bank. *Id*.

361.    Despite the continued recognition of the separate entity rule, Yellowstone through MCA Recovery routinely and systematically issues Restraining Notices on banks and other out-of-state third parties in knowing violation of the separate entity rule, thereby unlawfully restraining the use of funds located at branches outside the State of New York.

362.    Yellowstone through MCA Recovery has, in fact, issued unlawful Restraining Notices against out-of-state third parties in connection with the judgment it obtained against Y-CAPP, Pierce-Baylor, Coleman and the putative Class Members.

363.    The unlawful restraint of these funds constitutes a wrongful execution.

<u>**SEVENTH CAUSE OF ACTION**</u>
**(New York Penal Law §190.40)**

**By Plaintiffs and the Classes against
All Defendants**

364.    Plaintiffs and the putative Class Members repeat and re-allege the allegations set forth above herein.

365.    The transactions between (1) Plaintiffs and the Class Members, and (2) Arch, HSC, YCW and Yellowstone, were not true sales of receivables.

366.    Instead, each of the transactions was a loan that charged an interest rate exceeding twenty-five percent.

367.    Arch, HSC, YCW and Yellowstone entered into each transaction with the specific intent of charging and receiving interest in excess of twenty-five percent.

368.     Each of the Agreements is a criminally usurious loan under N.Y. Penal Law §

190.40, and thus, void and unenforceable.

369.     Plaintiffs and the Class Members have involuntarily paid principal and interest on

each of the Agreements for which they had no obligation to pay.

370.     The payments by Plaintiffs and the Class Members were involuntary because,

under the full recourse protections provided by the Agreements, Arch, HSC, YCW and

Yellowstone were entitled to compel repayment in the event of a non-payment by, among other

default remedies identified in the Agreements, filing a confession of judgment against Plaintiffs

and the Class Members, as well as charge Plaintiffs and the putative Class Members for their

attorney's fees in obtaining the judgment.

371.     In addition, if Plaintiffs and the putative Class Members failed to pay as required

under the Agreements, the full balance of the loan became immediately due and owing.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly

and severally, and seek an order from the Court:

a)      Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)      Declaring that the Agreements entered into between Class Members and Arch, HSC, YCW and Yellowstone constitute a loan transaction, and thus, are void because each intended to charge and receive a criminally usurious interest rate in excess of 25%;

c)      Declaring that the Restraining Notices issued by Yellowstone through MCA Recovery on out-of-state third parties is unlawful and permanently enjoining them from issuing future unlawful Restraining Notices;

d)      Declaring that the Levies and Demands issued by a New York City Marshal at the direction of Yellowstone through MCA Recovery on out-of-state third parties are

void and permanently enjoining them from directing a New York City Marshal to issue future unlawful Levies and Demands;

e)   Ordering Yellowstone and MCA Recovery to repay any funds unlawfully obtained through their illegal Levies and Demands;

f)   Declaring that the affidavits confessing judgment in connection with each of the criminally usurious loans violates N.Y. C.P.L.R. § 3218, and are thus void and unenforceable;

g)   Ordering Defendants to repay all principal and interest previously paid to Arch, HSC, YCW and Yellowstone in connection with the criminally usurious loans, including prejudgment interest;

h)   Granting an injunction against Arch, HSC, YCW and Yellowstone permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

i)   Awarding the Plaintiffs and Class Members direct and consequential damages;

j)   Awarding Plaintiffs and the Class Members treble damages;

k)   Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

l)   Granting such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class Members demand a trial by jury on all issues properly so tried.

Dated:  August 8, 2018

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
Justin E. Proper
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

66